NORTH CAROLINA ASSOCIATION FOR RETARDED CHILDREN et al., Plaintiffs,

and

United States of America, Plaintiff-Intervenor,

v.

STATE OF NORTH CAROLINA et al., Defendants.

Civ. No. 3050.

United States District Court, M. D. North Carolina, Raleigh Division.

Oct. 1, 1976.

Irvin B. Tucker, Jr., Raleigh. N. C. (Blanchard, Tucker, Twiggs & Denson, Raleigh, N. C.), for plaintiffs.

Louis M. Thrasher and Thomas R. Sheran, U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor.

William F. O'Connell, Sp. Deputy Atty. Gen., and Isaac T. Avery, III, Associate Atty., N. C. Dept. of Justice, Raleigh, N. C., for defendants.

Before CRAVEN, Circuit Judge, LARKINS, Chief District Judge, and DUPREE, District Judge.

CRAVEN, Circuit Judge:

What is now before this three-judge court is a piece of a much more ambitious lawsuit that involves the whole panoply of constitutional rights of mentally retarded persons in North Carolina. Because the legislature of North Carolina has changed or repealed most of the statutes relating to the treatment, training, and education of retarded children, we have concluded that all such questions presented by the pleadings should be severed from the issue relating to the constitutionality of the sterilization statute as applied to mentally retarded persons. We have retained only the latter, and have remanded all other questions to a single judge of the Eastern District of North Carolina for decision.

## I.

Based upon the pleadings and documents received in evidence or judicially noticed, and upon the depositions and the live testimony heard at Wilmington, North Carolina, we make the following ultimate findings of fact:

1. The statute under attack is N.C.Gen. Stat. §§ 35–36 through –50, entitled Article 7, Sterilization of Persons Mentally Ill and Mentally Retarded. Plaintiffs attack its constitutionality as applied and applicable to mentally retarded persons.

2. As defined by the American Association of Mental Deficiency, mental retardation refers to significantly subaverage general intellectual functioning existing concurrently with defects in adaptive behavior and manifested during the developmental period.[1]

3. Another section of the same North Carolina Chapter defines mental defective as follows:

A "mental defective" shall mean a person who is not mentally ill but whose mental development is so retarded that he has not acquired enough self-control, judgment, and discretion to manage himself and his affairs, and for whose own welfare or that of others, supervision, guidance, care, or control is necessary or advisable. The term shall be construed to

---

1. Testimony of Dr. James D. Clements (taken from AAMD *Manual on Terminology and Classification of Mental Retardation* (1973), p. 11).

include "feeble-minded," "idiot," and "imbecile."

N.C.Gen.Stat. § 35–1.1.

4. Sterilization is a drastic procedure, almost impossible to reverse in females and difficult and uncertain to reverse in males, that is intended to be permanent and prevent procreation. It is not, medically speaking, a dangerous procedure.

5. Most competent geneticists now reject social Darwinism and doubt the premise implicit in Mr. Justice Holmes' incantation that " . . . three generations of imbeciles is enough." But however doubtful is the efficacy of sterilization to improve the quality of the human race, there is substantial medical opinion that it may be occasionally desirable and indicated. Not even Dr. Clements, who testified for the United States and expressed strongly his general disapproval of sterilization for the mentally retarded, would go so far as to say that in an extreme case he would not use an involuntary sterilization statute if available. We think it a fair statement, from the expert testimony we have heard and read, to say that the best opinion presently is that rarely would a competent doctor recommend involuntary sterilization— but that he might do so in an extreme case. As a corollary to that proposition, it is also fair to say, we think, that prevalent medical opinion views with distaste even voluntary[2] sterilization for the mentally retarded and is inclined to sanction it only as a last resort and in relatively extreme cases. In short, the medical and genetical experts are no longer sold on sterilization to benefit either retarded patients or the future of the Republic.

6. The statute under attack became effective January 1, 1975. Since that time, only one resident of a North Carolina mental retardation center has undergone sterilization pursuant to the statutory procedure.

7. Between June 1970 and April 1974, 23 sterilizations were performed upon residents of North Carolina's mental retardation centers pursuant to the provisions of the preceding statute. Viewed over a longer time span, there has been a diminishing frequency in use of the sterilization procedure, reflecting, we think, diminishing confidence of medical doctors in its efficacy for any purpose except to prevent conception. That it will do.

8. Mental retardation is a difficult, complex phenomenon. The nature of retardation, its causes and effects are not susceptible to facile generalizations. The problem in this litigation is compounded in that the plaintiff class is very broadly defined, and includes all mentally retarded persons in North Carolina, regardless of their ages, the causes of their retardation, the degree of their intellectual, mental and social capabilities, their prospects for future growth and development.

9. Some general propositions nevertheless must be regarded as established by the evidence in this case. We emphasize that the following statements do *not* apply to all or even a majority of the plaintiff class. All, however, are true with respect to at least some members of the class:

(a) Mental retardation in some cases has as its cause an identifiable genetic defect. Under some circumstances it is within the capability of modern medical and genetical science to establish that the genetic defect is inheritable and that there is a significant probability or substantial likelihood that the offspring of a mentally defective parent would also be retarded.

(b) Mental retardation in some cases can be traced to an environment which blocks or shrinks the mental and intellectual development of a child. Under some circumstances it is within the capability of modern medical and sociological science to determine that a mentally retarded parent or parents would be incapable of providing offspring with an environment in which a child could reasonably be expected to develop in a normal manner. As a corollary to

---

2. Because mentally retarded persons are often highly suggestible, to say it is "voluntary" may mean only that the retardee has been talked into it without even necessarily understanding it.

this proposition, it is in some cases possible to predict with substantial accuracy that a mentally retarded person would be incapable of discharging the responsibilities of parenthood.

(c) While mentally retarded persons may be entitled to express themselves sexually, it can in some cases be determined that a mentally defective person does not understand or cannot appreciate the natural consequences of sexual activity. It can, likewise, be determined in some cases that the conception of a child is neither the intention nor the expectation of the sexually active mental retardate.

(d) Some mentally retarded persons who are sexually active may not want children. While many sexually active retarded persons are capable of employing various methods of birth control effectively, some are incapable of effective voluntary contraception.

(e) In rare and unusual cases, it can be medically determined that involuntary sterilization is in the best interests of either the mentally retarded person or the State or both.

## II.

The statute is applicable to persons "mentally ill" or "mentally retarded," but we are here concerned only with those provisions which relate to mentally retarded persons.

The statute authorizes both voluntary and involuntary sterilizations. It applies to mentally defective persons housed in state institutions and those who are not patients in state institutions. In the case of a patient who is confined in a state institution, the person in charge of the sterilization procedure is the director of the institution. For retarded persons not in state institutions, the key official is the county director of Social Services. The appropriate state or county official is authorized by the statute to petition the state district court for the sterilization of the mentally retarded person when it "may be considered in the best interest of the mental, moral, or physical improvement" of the retarded person, "or for the public good." The sterilization operation, whether voluntary or involuntary, is paid for by the State or the county in which the retarded person lives.

The statute expressly provides that sterilization operations shall only be performed by qualified, licensed North Carolina physicians and then only pursuant to an order issued by an appropriate state court. If the person to be sterilized wishes to select his own physician, he may do so but must then pay for the costs and expenses of the operation. Otherwise the physician is selected by the "petitioner," i. e., the director of the institution or the county director of Social Services.

Section 35–39 makes it the *duty* of the petitioner to institute sterilization proceedings under the following circumstances:

(1) when he feels that sterilization is in the best interests of the mental, moral or physical improvement of the retarded person,

(2) when he feels that sterilization is in the best interests of the public at large,

(3) when, in his opinion, the retarded person "would be likely, unless sterilized, to procreate a child or children who would have a tendency to serious physical, mental, or nervous disease or deficiency; or, because of a physical, mental, or nervous disease or deficiency which is not likely to materially improve, the person would be unable to care for a child or children."

(4) when the next of kin or legal guardian of the retarded person requests that he file the petition.

We conclude that subparagraph 4 of Section 39 is irrational and irreconcilable with the first three subparagraphs. The first three paragraphs make out a complete and sensible scheme: that the public servant concern himself *either* with the best interest of the retarded person *or* the best interest of the public, or both, *and* that he act to begin the procedure *only* when in his opinion the retarded person would either likely procreate a defective child or would himself be unable to care for his own child or children. All of this makes sense. The

fourth subparagraph does not. Instead, it grants to the retarded person's next of kin or legal guardian the power of a tyrant: for any reason, or for no reason at all, he may *require* an otherwise responsible public servant to initiate the procedure. This he may do without reference to any standard and without regard to the public interest or the interest of the retarded person. We think such confidence in *all* next of kin and *all* legal guardians is misplaced, and that the unstated premises of competency to decide to force initiation of the proceeding and never failing fidelity to the interest of the retarded person are invalid. We hold this subsection four unconstitutional as an arbitrary and capricious delegation of unbridled power and a correspondingly irrational withdrawal of responsibility sensibly placed upon the director of the institution or the county director of Social Services by the other three coherent and compatible subparagraphs.

Written into § 35–39 are two fundamental but unarticulated premises. First, the statute presumes that it is possible in some cases to determine that the retarded person has a genetic defect which likely would be inherited by his children. Secondly, the statute presumes that some persons may be so severely retarded that they would be unable to properly care for a child should they conceive one. As determined in the findings of fact, *supra,* we are of the opinion that in some cases, rare though they may be, these two general presumptions inherent in the statute are valid.

The petition which is filed with the district court is required to contain information from which the district court will be able to make appropriate findings of fact and conclusions of law regarding the propriety of the requested sterilization operation. The petition must contain the results of psychological or psychiatric testing which support the petitioner's assertion that the retarded person is subject to the statute and must contain any statement by an examining physician which indicates "any known contra indication to the requested surgical procedure." The petition also re-

quires the written consent or objection of the legal guardian or next of kin of the retarded person, and if there is none provides for appointment of a guardian ad litem "who *shall* make investigation and report to the court . . . ." The petition "should also contain the consent or objection of the person upon whom the sterilization operation is to be performed." If the mentally retarded person is incapable of giving his consent or registering his objection, the petitioner must certify to the court that the procedure has been explained to the person.

A copy of the petition filed with the district court must be served upon the retarded person and his legal or natural guardian or a guardian ad litem or next of kin at least 20 days prior to the hearing on the petition. The district court is also authorized to conduct an investigation in certain circumstances.

After the petition is filed and upon appropriate notice to the retarded person and upon his request, a hearing will be held in the district court without a jury. Unless the retarded person or his representative objects, the hearing may be conducted without witnesses and the judge may enter judgment. If a hearing is requested and the retarded person does desire the appearance of witnesses, he is entitled to present evidence in his own behalf. The retarded person is likewise guaranteed the right to cross-examine witnesses who testify in support of the petition. Before the district court judge may enter an order requiring that the operation be performed, he must make the findings of fact required by § 35–43, which amounts to a judicial determination that the allegations contained in the petition are true.

■ We construe this Section 43 to mean that the judge must find that the subject is likely to engage in sexual activity without utilizing contraceptive devices and is therefore likely to impregnate or become impregnated. We derive that meaning from the clause of the statute saying " . . . because the person would be likely, unless sterilized, to procreate a child or children

. . . ." Although the phrase is not contained in the prior clause, it must have been the sense of the legislature to require only that which is necessary, and unless sexual activity and inability or unwillingness to utilize contraception is indicated by the evidence, there would be no occasion for resort to sterilization.

If the retarded person is dissatisfied with the outcome in the district court, an appeal as of right is available to the superior court for a trial de novo before a jury. The result in the superior court may be appealed through the normal appellate channels to the North Carolina Court of Appeals and to the North Carolina Supreme Court.

Section 35–45 establishes the retarded person's right to counsel and assures that this right must be protected "at all stages of the proceedings provided for herein." The statute provides for "*Miranda*-type" advice to the retarded person of entitlement to counsel at the time notice of the petition is given. Moreover, "this information shall be given in language and in a manner calculated to insure, insofar as such is possible in view of the individual's capability to comprehend it, that the recipient understands the entitlement." The retarded person is entitled to retain counsel, or, in the case of indigency, an attorney must be appointed.

The remaining sections of the statute govern the sterilization procedure after the court order has been entered, and presumably, affirmed, if appealed.

Other provisions of North Carolina law, which apply to civil proceedings generally, must also be regarded as applicable to proceedings under the sterilization statute. N.C.Gen.Stat. § 8–59 provides that the retarded person would have the ability to subpoena witnesses in his own behalf for proceedings before the district court. *See also* Rule 45, N.C. Rules of Civil Procedure, N.C.Gen.Stat. 1A–1. N.C.Gen.Stat. § 7A–198 provides for the reporting of all cases in the district court unless waived by consent of all parties, and N.C.Gen.Stat. § 7A–95 provides for similar reporting in the superior court. N.C.Gen.Stat. § 1–288 makes a transcript of the proceedings available to the retarded person, even if he is unable to pay the expense.

The statute does not contain any statement of the petitioner's burden of proof. But the North Carolina Supreme Court, in *In re Sterilization of Moore,* 289 N.C. 95, 221 S.E.2d 307 (1976), announced that "in keeping with the intent of the General Assembly, clearly expressed throughout the article, that the rights of the individual must be fully protected, we hold that the evidence must be *clear, strong and convincing* before such an order may be entered." (Emphasis added.)

### III.

The United States as intervenor and the original plaintiff urge that we hold Article 7 of Chapter 35 of the North Carolina General Statutes unconstitutional insofar as it provides for sterilization of mentally retarded persons. The reasons advanced are identical to those urged upon the North Carolina Supreme Court with respect to the same statute and rejected by that court in a carefully reasoned opinion by Mr. Justice Moore. *In re Moore, supra.*

 We hold that the legislative classification of mentally retarded persons is neither arbitrary nor capricious, but rests upon respectable medical knowledge and opinion that such persons are in fact different from the general population and may rationally be accorded different treatment for their benefit and the benefit of the public. Moreover, the classification is itself narrowed as to impact so that, as we interpret it, only mentally retarded persons who are sexually active, and unwilling or incapable of controlling procreation by other contraceptive means, *and* who are found to be likely to procreate a defective child, *or* who would be unable because of the degree of retardation to be able to care for a child, may be sterilized. The legislative dual purpose—to prevent the birth of a defective child or the birth of a nondefective child that cannot be cared for by its parent—reflects a compelling state interest and the

classification rests upon a difference having a fair and substantial relation to the object of the legislation and does not, therefore, violate the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. *Cf. Stanton v. Stanton,* 421 U.S. 7, 14, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975).

■ The traditional equal protection test is invidious discrimination. *Williamson v. Lee Optical Co.,* 343 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Indeed the Supreme Court has often gone so far as to justify setting aside legislative classifications "only if no grounds can be conceived to justify them." *McCowan v. United States,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Schilb v. Kuebel,* 404 U.S. 357, 364, 92 S.Ct. 479, 484, 30 L.Ed.2d 502 (1971). But the Court has also said that a statutory classification based upon suspect criteria or affecting fundamental rights will encounter equal protection difficulties unless justified by a compelling governmental interest. *Shapiro v. Thompson,* 394 U.S. 618, 634, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (*Schilb v. Kuebel,* 404 U.S. 357, 365, 92 S.Ct. 479, 484, 30 L.Ed.2d 502 (1971)). We think that all mentally retarded persons are sufficiently different from the general population to justify classification for some purposes without meeting the compelling governmental interest test. But we also think that the right to procreate is a fundamental one and that under equal protection challenge sterilization cannot be ordered short of demonstrating a compelling governmental interest. *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

■ We hold that the statute is not overly broad. Although it permits initiation of the sterilization procedure against any and all members of the class, it does *not* contemplate that all members of the class will be sterilized. Nor is the standard of selection so vague that it cannot be comprehended and applied. As we have made clear in our findings of fact, we are convinced that competent medical doctors and geneticists can predict in some cases with reasonable accuracy the likelihood of birth of a defective child and also the likelihood of whether the parent will be able to care for his child. The burden of proof put upon the petitioner by the North Carolina Supreme Court that the evidence must be clear, strong and convincing strongly protects against predictive error and should effectively limit application of the statute to those members of the class within the stated legislative purpose. Failure to prove predictability would require, of course, denial of an order authorizing sterilization.

■ For the reasons stated by Mr. Justice Moore for the Supreme Court of North Carolina, we hold that the statute is procedurally adequate to survive challenge under the Due Process Clause of the Fourteenth Amendment.

■ Finally we consider briefly the contention that the statute is invalid as a matter of "substantive" due process. We agree with the United States that the right to procreate is a fundamental right, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed.2d 1655 (1942). As such it is protected by the Fourteenth Amendment's concept of personal autonomy and perhaps by other specific Amendments within the Bill of Rights. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The due process test of constitutionality of a statute that infringes upon a fundamental right is more than the ordinary one of a rational relationship to a valid state objective. To sustain this statute against substantive due process challenge it must be found that the state's interest is "compelling." We interpret Article 7 as narrowly drawn to express only the legitimate State interest of preventing the birth of a defective child or the birth of a nondefective child that cannot be cared for by its parent, and that so viewed, the State's interest rises to the dignity of a compelling one. It would be otherwise had the State presumed to enact and implement that *all* mentally retarded persons should be sterilized. That is *not* the thrust of the statute.

By way of summary we hold that the entire statutory scheme embraced in Article 7 of Chapter 35, §§ 36–50, is constitutional except for subparagraph four of § 39. We construe the statute to mean that a sterilization procedure may be initiated only by the director of the institution in which the retarded person resides or by the county director of social services. We further construe the statute to mean (§ 43) that before an order of sterilization can be entered, there must be a finding from evidence that is clear, strong and convincing that the subject is likely to engage in sexual activity without using contraceptive devices and that either a defective child is likely to be born or a child born that cannot be cared for by its parent. So construed, the statute is valid.

An appropriate judgment will be entered in accordance with this opinion.