[No. 45612. En Banc. March 27, 1980.]

*In the Matter of the Guardianship of*
EDITH MELISSA MARIA HAYES.

*Ries & Kenison,* by *Darrell E. Ries* and *Larry W. Larson,* for appellant.

*Collins & Hansen,* by *Howard W. Hansen* and *Nels A. Hansen,* for respondent.

*Karen Marie Thompson* and *Catherine C. Morrow* on behalf of Legal Advocates for the Disabled and *Linda Potter, Judith E. Cohn, Michael S. Lottman,* and *Norman S. Rosenburg* on behalf of Mental Health Law Project, amici curiae.

HOROWITZ, J.—This appeal raises the question whether the Superior Court for Grant County has authority to grant a petition for sterilization of a severely mentally retarded person.

Petitioner Sharon Hayes is the mother of Edith Melissa Maria Hayes, who was born severely mentally retarded on December 17, 1963. She petitioned the Superior Court for an order appointing her as the guardian of Edith's person and specifically authorizing a sterilization procedure on Edith. The court dismissed the petition on a motion for summary judgment on the ground it had no authority to issue an order for sterilization of a retarded person. Petitioner appeals the court's conclusion it cannot authorize sterilization of a mentally incompetent person. She does not raise the question whether the court properly denied her petition to be appointed guardian of Edith's person.

We hold that the Superior Court has jurisdiction to entertain and act upon a request for an order authorizing sterilization of a mentally incompetent person under the

broad grant of judicial power in Const. art. 4, § 6. We further hold that, in the absence of controlling legislation, the court may grant such a petition in the rare and unusual case that sterilization is in the best interest of the retarded person. We therefore reverse the order granting summary judgment and remand for further proceedings consistent with this opinion.

Edith Hayes is severely mentally retarded as a result of a birth defect. Now 16 years old, she functions at the level of a 4– or 5–year–old. Her physical development, though, has been commensurate with her age. She is thus capable of conceiving and bearing children, while being unable at present to understand her own reproductive functions or exercise independent judgment in her relationship with males. Her mother and doctors believe she is sexually active and quite likely to become pregnant. Her parents are understandably concerned that Edith is engaging in these sexual activities. Furthermore, her parents and doctors feel the long term effects of conventional birth control methods are potentially harmful, and that sterilization is the most desirable method to ensure that Edith does not conceive an unwanted child.

Edith's parents are sensitive to her special needs and concerned about her physical and emotional health, both now and in the future. They have sought appropriate medical care and education for her, and provided her with responsible and adequate supervision. During the year or so that Edith has been capable of becoming pregnant, though, they have become frustrated, depressed and emotionally drained by the stress of seeking an effective and safe method of contraception. They believe it is impossible to supervise her activities closely enough to prevent her from becoming involved in sexual relations. Thus, with the consent of Edith's father, Sharon Hayes petitioned for an order appointing her guardian and authorizing a sterilization procedure for Edith.

# I
## JURISDICTION

Edith's court appointed guardian ad litem contended below, and now maintains on appeal, that a superior court has no power to authorize a sterilization absent specific statutory authority. He cites in support of that view cases from other jurisdictions in which courts have concluded that specific statutory authority is required. *Wade v. Bethesda Hosp.,* 337 F. Supp. 671 (S.D. Ohio 1971); *In re Guardianship of Kemp,* 43 Cal. App. 3d 758, 118 Cal. Rptr. 64, 74 A.L.R.3d 1202 (1974); *A.L. v. G.R.H.,* 163 Ind. App. 636, 325 N.E.2d 501, 74 A.L.R.3d 1220 (1975), *cert. denied,* 425 U.S. 936, 48 L. Ed. 2d 178, 96 S. Ct. 1669 (1976); *In Interest of M.K.R.,* 515 S.W.2d 467 (Mo. 1974); *Frazier v. Levi,* 440 S.W.2d 393 (Tex. Civ. App. 1969); *Holmes v. Powers,* 439 S.W.2d 579 (Ky. App. 1968).

These cases are not controlling. Their results are conclusory, as none of them demonstrates any controlling legal principle prohibiting a court of general jurisdiction from acting upon a petition for sterilization. They suggest instead a preference that the difficult decisions regarding sterilization be made by a legislative body. This is not simply a denial of jurisdiction, but an abdication of the judicial function. We are mindful that a court "cannot escape the demands of judging or of making . . . difficult appraisals." *Haynes v. Washington,* 373 U.S. 503, 515, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1973).

■ Persuasive authority for the principle that courts of general jurisdiction do have jurisdiction over a petition by a parent or guardian for an order authorizing sterilization is found in the United States Supreme Court opinion in *Stump v. Sparkman,* 435 U.S. 349, 55 L. Ed. 2d 331, 98 S. Ct. 1099 (1978). In that case a woman sterilized pursuant to court order when she was a child later brought a civil rights action against the judge who issued the order. The question was whether the judge lacked judicial immunity for the act. The court determined the judge's conduct in entertaining and approving the petition for sterilization constituted a

judicial act, and that he had not acted in the clear absence of all jurisdiction. With regard to the jurisdiction issue, the court noted the judge was a member of a court which had broad jurisdiction at law and in equity, and which was not prohibited from considering a petition for sterilization by either statute or controlling case law. It concluded the judge had "the power to entertain and act upon the petition for sterilization" and was entitled to judicial immunity in the suit. *Stump v. Sparkman, supra* at 364. *See generally* Note, *Judicial Immunity*, 11 Ind. L. Rev. 489 (1978).

The courts of this state have long recognized the inherent power of the superior court "to hear *and determine* all matters legal and equitable in all proceedings known to the common law". (Italics ours.) *In re Hudson*, 13 Wn.2d 673, 697–98, 126 P.2d 765 (1942). Original jurisdiction is granted to superior courts over all cases and proceedings in which jurisdiction is not vested exclusively in some other court by Const. art. 4, § 6. Under this broad grant of jurisdiction the superior court may entertain and act upon a petition from the parent or guardian of a mentally incompetent person for a medical procedure such as sterilization. No statutory authorization is required. The rule stated in *In re Hudson* regarding the jurisdiction of the court over infants is equally applicable to those in need of guardianship because of severe mental retardation:

> We agree . . . that the superior courts of this state are courts of general jurisdiction and have power to hear and determine all matters legal and equitable in all proceedings known to the common law, except in so far as those have been expressly denied; that the jurisdiction of a court of equity over the persons, as well as the property, of infants has long been recognized; and that the right of the state to exercise guardianship over a child does not depend on a statute asserting that power. *Weber v. Doust*, 84 Wash. 330, 146 Pac. 623 . . .

*In re Hudson, supra* at 697–98.

Nor is a statute required to empower a superior court to exercise its jurisdiction by granting a petition for sterilization. We recognize the power of the legislature, subject to

the state and federal constitutions, to enact statutes regulating sterilization of mentally incompetent persons in the custody of a parent or guardian. It has not done so, however. The relevant guardianship statute, RCW 11.92, defines the duties of a guardian to care for, maintain, and provide education for an incompetent person. The statute neither provides nor prohibits sterilization procedures at a guardian's request. It does not in any event derogate from the judicial power of the court which includes the power to authorize such a procedure where it is necessary. In the absence of any limiting legislative enactment, the superior court has full power to take action to provide for the needs of a mentally incompetent person, just as it has authority to do so to protect the interests of a child. *See In re Hudson, supra.* We hold the superior court of the State of Washington has authority under the state constitution to entertain and act upon a petition for an order authorizing sterilization of a mentally incompetent person, and in the absence of legislation restricting the exercise of that power, the court has authority to grant such a petition.

We note that courts in at least four other states have reached the same conclusion with regard to the authority of their own courts of general jurisdiction. In *In re Sallmaier,* 85 Misc. 2d 295, 378 N.Y.S.2d 989 (1976) the Supreme Court of the State of New York held it had power to grant a petition for sterilization under its common–law jurisdiction to act as parens patriae with respect to incompetents. Similar analysis was used by the Chancery Division of New Jersey's Superior Court in *In re L.G.,* No. C–1917–78E (N.J. Super., July 12, 1979). The Ohio probate court found authority in the plenary power, granted to the court by statute to dispose of all matters at law and in equity which are properly before the court. *In re Simpson,* 180 N.E.2d 206 (Ohio P. Ct. 1962). In *Ex Parte Eaton* (Baltimore Cir. Ct. 1954), the Circuit Court of Baltimore, Maryland, held it could issue an order for sterilization under its general equity powers. Furthermore, the power of a state court to order sterilization without specific statutory authorization

was impliedly recognized by a federal district court in *Wyatt v. Aderholt,* 368 F. Supp. 1383 (M.D. Ala. 1974).

We therefore hold that Const. art. 4, § 6 gives the superior courts of this state the jurisdiction to entertain and act upon a request for an order authorizing sterilization of a mentally incompetent person.

## II
### Standards for Sterilization

Our conclusion that superior courts have the power to grant a petition for sterilization does not mean that power must be exercised. Sterilization touches upon the individual's right of privacy and the fundamental right to procreate. *North Carolina Ass'n for Retarded Children v. North Carolina,* 420 F. Supp. 451, 458 (M.D.N.C. 1976), citing *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029, (1972); *Skinner v. Oklahoma,* 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942). *See also* P. Friedman, *The Rights of Mentally Retarded Persons* 117–19 (1976) (hereinafter cited as *Mentally Retarded Persons*). It is an unalterable procedure with serious effects on the lives of the mentally retarded person and those upon whom he or she may depend. Therefore, it should be undertaken only after careful consideration of all relevant factors. We conclude this opinion with a set of guidelines setting out the questions which must be asked and answered before an order authorizing sterilization of a mentally incompetent person could be issued. First, however, the considerations which are important to this determination can be best illuminated by discussing briefly the historical context from which they arise.

Sterilization of the mentally ill, mentally retarded, criminals, and sufferers from certain debilitating diseases became popular in this country in the early 20th century. The theory of "eugenic sterilization" was that the above named traits and diseases, widely believed at that time to

be hereditary, could be eliminated to the benefit of all society by simply preventing procreation.

More than 20 states passed statutes authorizing eugenic sterilizations. Washington passed a punitive sterilization law aimed at habitual criminals and certain sex offenders in 1909. The law exists today as RCW 9.92.100. Another statute, also enacted early in the century, denied certain persons, including the mentally retarded, the right to marry unless it is established that procreation by the couple is impossible. RCW 26.04.030, repealed by Laws of 1979, 1st Ex. Sess., ch. 128, § 4. While this statute did not authorize sterilizations, it was clearly based on eugenic principles.

In 1921 the Washington legislature enacted a law providing for sterilization of certain mentally retarded, mentally ill and habitually criminal persons restrained in a state institution. Laws of 1921, ch. 53, p. 162. This statute was held unconstitutional because of its failure to provide adequate procedural safeguards in *In re Hendrickson,* 12 Wn.2d 600, 123 P.2d 322 (1942).

The United States Supreme Court upheld the constitutionality of a eugenic sterilization law which provided adequate procedural safeguards, however, in *Buck v. Bell,* 274 U.S. 200, 71 L. Ed. 1000, 47 S. Ct. 584 (1927). Since that time it has generally been believed that eugenic sterilization statutes are constitutional although, as noted above, more recent Supreme Court decisions suggest the importance of respecting the individual's constitutional rights of privacy and procreation. *See generally* S. Brakel & R. Rock, *American Bar Foundation Study, the Mentally Disabled and the Law* (rev. ed. 1971) (hereinafter referred to as *A.B. Foundation Study*) and J. Robitscher, *Eugenic Sterilization* (1973) (hereinafter referred to as *Eugenic Sterilization*).

More recently scientific evidence has demonstrated little or no relationship between genetic inheritance and such conditions as mental retardation, criminal behavior, and diseases such as epilepsy. Geneticists have discovered, for example, that some forms of mental retardation appear to

have no hereditary component at all, while in some others the element of heredity is only one of a number of factors which may contribute to the condition. *See A.B. Foundation Study, supra* at 211; *Eugenic Sterilization, supra* at 113–16; *Mentally Retarded Persons, supra* at 115–17. In short, the theoretical foundation for eugenic sterilization as a method of improving society has been disproved.

At the same time other previously unchallenged assumptions about mentally retarded persons have been shown to be unreliable. It has been found, for example, that far from being an insignificant event for the retarded person, sterilization can have long–lasting detrimental emotional effects. *Eugenic Sterilization, supra* at 21–22; *Mentally Retarded Persons, supra* at 116. Furthermore, while retarded persons, especially children, are often highly suggestible, there is evidence they are also capable of learning and adhering to strict rules of social behavior. *Eugenic Sterilization, supra* at 19. Many retarded persons are capable of having normal children and being good parents. *Eugenic Sterilization, supra* at 20; *Mentally Retarded Persons, supra* at 116.

■ Of great significance for the problem faced here is the fact that, unlike the situation of a normal and necessary medical procedure, in the question of sterilization the interests of the parents of a retarded person cannot be presumed to be identical to those of the child. The problem of parental consent to sterilization is of great concern to professionals in the field of mental health, and the overwhelming weight of opinion of those who have studied the problem appears to be that consent of a parent or guardian is a questionable or inadequate basis for sterilization. *See A.B. Foundation Study, supra* at 216; *Mentally Retarded Persons, supra* at 121; 2 *P.L.I. Mental Health Project,* at 1024 (1973); President's Committee on Mental Retardation, *The Mentally Retarded Citizen and the Law,* at 101–05 (1976); *Eugenic Sterilization, supra* at 121; Comment, *Sterilization, Retardation and Parental Authority,* 1978 B.Y.L. Rev. 380 (1978); Murdock, *Sterilization of the*

*Retarded: A Problem or a Solution?*, 62 Cal. L. Rev. 917, 932–34 (1974). *See also North Carolina Ass'n for Retarded Children v. North Carolina,* 420 F. Supp. 451, 456 (M.D.N.C. 1976). It is thus clear that in any proceedings to determine whether an order for sterilization should issue, the retarded person must be represented, as here, by a disinterested guardian ad litem.

■ Despite all that has been said thus far, in the rare case sterilization may indeed be in the best interests of the retarded person. This was recognized in *North Carolina Ass'n for Retarded Children v. North Carolina, supra* at 454–55. However, the court must exercise care to protect the individual's right of privacy, and thereby not unnecessarily invade that right. Substantial medical evidence must be adduced, and the burden on the proponent of sterilization will be to show by clear, cogent and convincing evidence that such a procedure is in the best interest of the retarded person.

Among the factors to be considered are the age and educability of the individual. For example, a child in her early teens may be incapable at present of understanding the consequences of sexual activity, or exercising judgment in relations with the opposite sex, but may also have the potential to develop the required understanding and judgment through continued education and developmental programs.

A related consideration is the potential of the individual as a parent. As noted above, many retarded persons are capable of becoming good parents, and in only a fraction of cases is it likely that offspring would inherit a genetic form of mental retardation that would make parenting more difficult.

Another group of relevant factors involves the degree to which sterilization is medically indicated as the last and best resort for the individual. Can it be shown by clear, cogent and convincing evidence, for example, that other methods of birth control are inapplicable or unworkable?

In considering these factors, several courts have developed sterilization guidelines. *See, e.g., North Carolina Ass'n for Retarded Citizens, supra* at 456–57; *Wyatt v. Aderholt, supra* at 1384–86; *In re L.G., supra* at 34–35. With the assistance of the brief of amicus Mental Health Law Project, a careful review of these considerations allows us to provide the superior court with standards to be followed in exercising its jurisdiction to issue an order authorizing sterilization of a mentally incompetent individual.

The decision can only be made in a superior court proceeding in which (1) the incompetent individual is represented by a disinterested guardian ad litem, (2) the court has received independent advice based upon a comprehensive medical, psychological, and social evaluation of the individual, and (3) to the greatest extent possible, the court has elicited and taken into account the view of the incompetent individual.

Within this framework, the judge must first find by clear, cogent and convincing evidence that the individual is (1) incapable of making his or her own decision about sterilization, and (2) unlikely to develop sufficiently to make an informed judgment about sterilization in the foreseeable future.

Next, it must be proved by clear, cogent and convincing evidence that there is a need for contraception. The judge must find that the individual is (1) physically capable of procreation, and (2) likely to engage in sexual activity at the present or in the near future under circumstances likely to result in pregnancy, and must find in addition that (3) the nature and extent of the individual's disability, as determined by empirical evidence and not solely on the basis of standardized tests, renders him or her permanently incapable of caring for a child, even with reasonable assistance.

Finally, there must be no alternatives to sterilization. The judge must find that by clear, cogent and convincing evidence (1) all less drastic contraceptive methods, including supervision, education and training, have been proved

unworkable or inapplicable, and (2) the proposed method of sterilization entails the least invasion of the body of the individual. In addition, it must be shown by clear, cogent and convincing evidence that (3) the current state of scientific and medical knowledge does not suggest either (a) that a reversible sterilization procedure or other less drastic contraceptive method will shortly be available, or (b) that science is on the threshold of an advance in the treatment of the individual's disability.

There is a heavy presumption against sterilization of an individual incapable of informed consent that must be overcome by the person or entity requesting sterilization. This burden will be even harder to overcome in the case of a minor incompetent, whose youth may make it difficult or impossible to prove by clear, cogent and convincing evidence that he or she will never be capable of making an informed judgment about sterilization or of caring for a child.

Review of the facts in this case in light of these standards makes it clear that the burden has not yet been met. It cannot be said that Edith Hayes will be unable to understand sexual activity or control her behavior in the future. The medical testimony and report of the mental health board are not detailed enough to provide clear, cogent and convincing evidence in this regard. Edith's youth is of particular concern, since she has many years of education before her. Furthermore, although there is evidence that some methods of birth control have already been tried, there is insufficient proof that no conventional form of contraception is a reasonable and medically acceptable alternative to sterilization. Nor is there any evidence such a procedure would not have detrimental effects on Edith's future emotional or physical health. Finally, there is no evidence that a pregnancy would be physically or emotionally hazardous to Edith, and insufficient evidence that she would never be capable of being a good parent.

Additional fact finding at the trial level will help the superior court judge answer the questions set out in this

opinion. Therefore, the case is reversed and remanded for further proceedings consistent with this opinion.

UTTER, C.J., and DOLLIVER and WILLIAMS, JJ., concur.

STAFFORD, J. (concurring specially in part in the majority and dissenting in part)—I have studied the majority and dissenting opinions with care. Both express great concern for basic personal rights and the possible impact of social policy upon those rights. Yet, in resolving those complicated, and often conflicting, issues in terms of constitutional jurisdiction, the majority and dissent are in fundamental opposition. The majority declares that constitutional jurisdiction over the person and subject matter clearly gives the judiciary power to determine the ultimate conflict. The dissent asserts with equal fervor that no jurisdiction exists, constitutional or otherwise, to resolve an issue of public policy which strikes so near the underpinnings of the right of privacy. My view of the appropriate resolution lies between the two competing theories, although it is more closely allied with the majority.

I agree with the majority that the judiciary has constitutional jurisdiction over both the subject matter and the persons involved. Having jurisdiction the courts possess inherent power to define the limits of the conflict between personal rights and the asserted needs of society and thus the power to resolve the instant dispute. The majority has proceeded into this thicket with caution. While declaring the power of the judiciary to act, it has imposed upon those who stress the social need for sterilization a strong burden of proof as a condition precedent to any implementation of the claimed need. By so doing, the majority has recognized the necessity of protecting the fundamental personal rights involved.

Nevertheless, despite the cautious approach employed, I am compelled to depart from the majority. I acknowledge existence of the judicial power to act. Possession of such power, however, neither requires that it be exercised nor

necessarily supports the wisdom of its exercise under all circumstances.

In this case we are concerned with the permanent and irreversible loss of a fundamental personal right. Those who seek to invade this right do so in the name of "social need", "social good" and even "personal well–being". Society, doubtless well intentioned, desires to "do what is best" for the person here involved. In my view, however, there are not only deep–seated medical, sociological, personal and legal issues, but a fundamental issue of public policy involved. What power, then, should society have in this regard; what personal rights should be protected from society; to what extent should they be protected; and in what manner?

It seems to me that having clearly declared the judiciary's power to act, wisdom dictates we should defer articulation of this complex public policy to the legislature. Such deferral, done with a clear declaration of judicial power, is not an abdication of that power. Rather, it is a recognition that the declared power can be rationally coupled with a conscious choice not to exercise it.

There will be sufficient time, after a legislative declaration of public policy, for this court to determine whether the declaration and implementation of that policy has been accomplished in a constitutional manner. There will be a sufficient opportunity, for example, for us to review and properly decide the most basic question of all—whether compulsory sterilization of mentally retarded persons should or should not be permitted and if so under what limitations, if any. We have not faced this most basic issue and have been unable to do so because of the limited nature of the briefs and limited facts in this case. By deferring the exercise of our power and permitting the legislature to declare the public policy, we will be able to meet these problems in a more acceptable and knowledgeable manner.

Since, contrary to my views, the judiciary plans to exercise its power to act in cases of this nature, it should do so

only under strict protective standards. Most of the standards enunciated by the majority fulfill this objective.

Without question those who seek intervention of the judiciary on "behalf" of an alleged mentally incompetent person usually will do so with the best of intentions. If the judiciary is willing to furnish the means of resolving such a critical issue, it should not on the one hand make the forum available and on the other hand make the burden of proof so impossible of accomplishment that the forum cannot be used. Unfortunately, the final standard proposed by the majority does just that.

The moving party is required to prove by clear, cogent and convincing evidence that "(3) *the current state of scientific and medical knowledge does not suggest* (a) that a reversible sterilization procedure or other less drastic contraceptive method *will shortly be available,* or (b) *that science is on the threshold of an advance in the treatment of the* individual's *disability.*" First, the standard requires the moving party to prove a negative. Second, it involves the judiciary in a questionable contest at three levels: (a) whether the movant has done sufficient research to establish that *no* medical breakthrough is possible in the foreseeable future; (b) whether a medical procedure possible in the next few years will become an actuality; and (c) whether the alleged mentally incompetent person will be able to take advantage of the nebulous scientific advance for physical or emotional reasons.

It is too much to ask the moving party, the alleged mentally incompetent person or the judiciary to litigate such nebulous eventualities of science.

HICKS, J., concurs with STAFFORD, J.

ROSELLINI, J. (dissenting)—In the exercise of the police power, the legislature has provided for sterilization of certain criminals, evidently upon the mistaken belief that the tendencies exhibited by such criminals are inheritable

(RCW 9.92.100). Today, the court has enacted its own statute, providing for the sterilization of children upon the petition of parents.

The majority recognizes that it has no real statutory authority to act in this area. It cites no authority supporting the proposition that the ordering of sterilization of human beings is among the inherent powers reserved to the courts. As stated in 20 Am. Jur. 2d *Courts* § 78 (1965), the inherent powers of a court do not increase its jurisdiction; they are limited to such powers as are essential to the existence of the court and the orderly and efficient exercise of its jurisdiction. As is made clear in section 79 of that encyclopedia, the powers pertain to matters procedural rather than substantive. They do not include the power to determine what laws will best serve the public welfare.

The majority's position, as I read it, is simply that the court has power to grant relief in any case that comes before it, whether or not that relief is authorized by constitution, statute, or principle of common law. If a complaint is filed, the majority indicates, the court can give a remedy. The need to state a claim "upon which relief can be granted" is eliminated from the requirements for maintaining an action.

Recognizing, fortunately, that the area in which it legislates today is a complex one, the majority has found it necessary to promulgate a number of rules regarding the burden of proof, assuring that when an action is brought under this law, the trial may be lengthy and expensive.

Not only because the courts lack inherent power to order such invasions of human privacy, but because the undertaking is of such grave consequence and error so irreversible, wise courts have acknowledged that only the people's representatives can rightly determine whether and under what circumstances such measures are desirable and necessary.

The majority of courts in the United States which have considered the question have held that, in the absence of specific statutory authorization, courts are not empowered

to order sterilization of incompetents. In an annotation entitled *Jurisdiction of court to permit sterilization of mentally defective person in absence of specific statutory authority,* 74 A.L.R.3d 1210, 1213 (1976), Thomas R. Trenkner says:

> Rejecting contentions that the jurisdiction to permit such sterilizations was impliedly conferred by general statutes empowering the courts to act on the behalf of infants, mental defectives, and other incompetent persons, or by statutes investing courts with general equitable powers, these courts seem to have generally taken the view, explicitly stated in one case, that an order for the compulsory sterilization of a mental defective, whatever may be the merits of the particular case, irreversibly denies to that human being the fundamental right to bear or beget children and thus is too awesome a power to be inferred from general statutory provisions, but rather should only be conferred by specific statutory authority which provides guidelines and adequate legal safeguards determined by the people's elected representatives to be necessary after full consideration of the constitutional rights of the individual and the general welfare of the people.

(Footnotes omitted.) The public policy of the State of Washington supports this view.

The legislature at one time provided for sterilization of certain mentally deficient persons. Laws of 1921, ch. 53, p. 162. In *In re Hendrickson,* 12 Wn.2d 600, 123 P.2d 322 (1942), this court, while recognizing that the enactment of a sterilization statute was within the police power of the legislature, held the act unconstitutional because of procedural defects. Since that time the legislature has not seen fit to enact another law authorizing such sterilizations, even though it has provided for sterilization of certain other types of individuals. This means that the legislature has not seen fit to vest the judiciary with the jurisdiction to order sterilization. The lack of legislative action indicates that sterilization of mentally deficient persons has not found sufficient public support to convince the legislative body of its efficacy.

Obviously, since such legislation lies in the sphere of the police power, it is not within the inherent power of the courts, and the legislature, until today, had every right to assume that the courts would not presume to write their own law upon the subject.

The majority apparently assumes that sterilization is a matter of indifference to the person upon whom it is performed, provided, of course, he is in fact retarded. Upon this subject, Kindregan, in *Sixty Years of Compulsory Eugenic Sterilization: "Three Generations of Imbeciles" and the Constitution of the United States,* 43 Chi.–Kent L. Rev. 123, 139–40 (1966), says:

> The third basic principle of CES [compulsory eugenic sterilization] is that sterilization is not usually felt to be a detriment by the defective person. Mr. Justice Holmes expressed this belief when he wrote that the loss of reproductive power is "....often not felt to be [a sacrifice] ... by those concerned." This may be true in the case of many imbeciles, idiots and persons prone to sexual perversion. But it can hardly be generalized of those suffering from feeblemindedness and epilepsy. One recent study indicated that many mental defectives who were forcibly sterilized by the state of California feel resentment. Others are aware that eugenic sterilization is contrary to the teaching of their religion. Some women who are capable of caring for the children of others, but have been forced to undergo CES, can only be described as bitter. The state has precluded their becoming mothers on the basis of "....a knowledge of the laws of heredity far beyond the reaches yet attained by humble scientists."

Any analysis of CES must ultimately reach this fundamental question: is the basis for this state action so apparent and reasonable that the legislature can authorize a substantial intrusion into the body of a human being? Mr. Justice Douglas has stated the seriousness of the answer to that question:

> ....We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the existence and survival of the race. There is no redemption for the individual

whom the law touches . . . he is forever deprived of a basic liberty.

(Footnotes omitted.)

The majority's reliance on *In re Hudson,* 13 Wn.2d 673, 126 P.2d 765 (1942) is misplaced. In that case, the Superior Court had ordered the amputation of a child's enormously enlarged arm. In a much criticized decision, this court reversed, finding the lower court lacked jurisdiction because the parents were not shown to have neglected the child within the meaning of the statute giving the courts power to take custody of dependent children. This decision was reached in spite of the fact that it was established by competent medical testimony that the operation was imperative for the child's physical and mental health.

Thus, what this court had to say in that case about the powers of the Superior Court under the then juvenile court act (Rem. Rev. Stat. § 1987) was dictum. However, I have no quarrel with it, since it merely recognized the court's power to order medical care for a dependent child. That is not the question here. This action was not brought under that statute, and had it been, the question before us would be, Did the legislature, when it authorized the court to make "any order, which in the judgment of the court, would promote the child's health and welfare" (Rem. Rev. Stat. § 1987–10), intend to give it power to order sterilization? I rather doubt that even the majority here would be inclined to give the language such a liberal interpretation. Observing the recitation of relevant facts in the majority opinion, it would appear that the focal point of concern is the welfare of the parents more than the health and welfare of the child. Their welfare may indeed be a legitimate social concern, but it is for the legislature to determine whether the public interest warrants the protection of parents from the anxieties, stresses and responsibilities thrust upon them in those circumstances, as well as whether the adverse effect of pregnancies on retarded or mentally deficient children is a problem which warrants a court intervention.

An annotation at 74 A.L.R.3d 1224 (1976) reveals that to date no court has held that a parent has the power to order sterilization of his child, whether a minor or adult.

Denying a declaratory judgment that a parent had such right, the Indiana Court of Appeals said, in *A.L. v. G.R.H.*, 163 Ind. App. 636, 638, 325 N.E.2d 501, 74 A.L.R.3d 1220 (1975), *cert. denied*, 425 U.S. 936, 48 L. Ed. 2d 178, 96 S. Ct. 1669 (1976):

> In considering the facts at hand, it should be first noted that we are not dealing with a legislative enactment permitting sterilizations without consent where certain conditions exist.
>
> Secondly, the facts do not bring the case within the framework of those decisions holding either that the parents may consent on behalf of the child to medical services necessary for the child, or where the state may intervene over the parents' wishes to rescue the child from parental neglect or to save its life.
>
> Permanent sterilization as here proposed is a different matter. Its desirability emanates not from any life saving necessities. Rather, its sole purpose is to prevent the capability of fathering children.
>
> We believe the common law does not invest parents with such power over their children even though they sincerely believe the child's adulthood would benefit therefrom. This result has been reached most recently in *In Interest of M.K.R.* (Mo. 1974), 515 S.W.2d 467, and *In re Kemp's Estate* (1974) 43 Cal. App. 3d 758, 118 Cal. Rptr. 64, where the courts of Missouri and California held that their respective juvenile statutes making general provision for the welfare of children were insufficient to confer jurisdiction to authorize the sterilization of retarded girls in the absence of specific sterilization legislation.

(Footnotes and citations omitted.)

The United States Supreme Court has not held that a state court has inherent power to order sterilization. In *Stump v. Sparkman*, 435 U.S. 349, 55 L. Ed. 2d 331, 98 S. Ct. 1099 (1978), cited by the majority, the issue was whether a judge who had ordered a minor girl sterilized was

immune from liability to that girl when she reached majority, married, and discovered the author of her inability to have children. The court held that judges of the courts of superior or general jurisdiction are not liable in a civil action for their judicial acts, even when such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly and even though grave procedural errors occur.

The Supreme Court majority was obviously intent upon protecting the judge's immunity. The opinion certainly does not stand as an endorsement of judicially ordered sterilizations but rather as an uncompromising assertion of such immunity. I would say that it also stands as an ominous warning of how easily the asserted power to order sterilization can be mistakenly exercised.

In 1922, a great number of states adopted sterilization laws based upon the eugenic theory that human defectives could be eliminated and this would result in the improvement of the human race. The fallacy of this assumption has been demonstrated by geneticists. *See* Kindregan, *Sixty Years of Compulsory Eugenic Sterilization: "Three Generations of Imbeciles" and the Constitution of the United States,* 43 Chi.–Kent L. Rev. 123 (1966). According to his article, the overwhelming weight of scientific opinion is that defects such as retardation are not demonstrably inheritable in the case of an individual defective person. He further points out that 89 percent of all feebleminded children are born to normal parents.

The majority assumes that it is established that sterilization may be beneficial to society. And yet scientific studies cast grave doubts upon the correctness of this assumption. In a Note, *Eugenic Sterilization—A Scientific Analysis,* 46 Denver L.J. 631, 633–34 (1969), the author says:

> [T]he fact that *some* sterilizations continue to be performed and that, in any event, the threat remains of possible sterilization being imposed, even though there is questionable scientific value in such procedures, makes this a topic of continuing timeliness and interest.

Numerous legal, medical, and sociological reviews have been published on the subject, most of them unfavorable in their appraisal. The basic criticisms have been that eugenic sterilization does not accomplish its stated objective of "human betterment," and, at the same time, it interferes with important freedoms either expressly guaranteed by the *United States Constitution* or brought within its ambit by judicial construction.

(Footnotes omitted.)

My great concern is that the courts do not become "an imperial judiciary," a phrase coined, I believe, by Nathan Glaser. In his book *Power,* written late in his career, Adolph Berle spoke of the United States Supreme Court as a benevolent dictatorship. And Phillip Kurland has often traced the Supreme Court's wandering in the political thicket with no compass for a guide, save its own subjective fancies.

The rule of law is not well served by handing unrestricted policy–making power to a shifting majority of as few as five whose judgment, as Justice Jackson would say, is not final because it is infallible, but infallible because it is final.

I would affirm the judgment of dismissal.

WRIGHT and BRACHTENBACH, JJ., concur with ROSELLINI, J.