469 So.2d 588 (1985)
ANONYMOUS
v.
ANONYMOUS.
84-190.
Supreme Court of Alabama.
April 12, 1985.
David J. Evans, Jr. and Gina Matthews, Boaz, Guardians ad Litem and counsel for appellant.
F. Timothy Riley of Carnes & Carnes, Albertville, for appellee.
BEATTY, Justice.
The judgment appealed from is reversed on the authority of Hudson v. Hudson, 373 So.2d 310 (Ala.1979). Having considered the record and briefs, we hereby remand the case for the entry of an order dismissing the cause and assessing costs against petitioner, including fees of the guardians ad litem for legal services rendered in the trial and on the appeal.
REVERSED AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and MADDOX, ALMON, SHORES and ADAMS, JJ., concur.
FAULKNER and JONES, JJ., dissent.
EMBRY, J., recuses himself.
JONES, Justice (dissenting).
With all due respect, I would remand this cause to the trial court for reconsideration pursuant to the stringent guidelines proposed in the following dissenting opinion.
Appellees, the natural parents of a fourteen-year-old daughter, filed in the circuit court a "Petition for Sterilization of Mentally Deficient Child." The petition alleged that the child has the intelligence level of a four-year-old; that she cannot care for herself; that she is often at a special school and out of the physical control of her parents; and "that such a sterilization procedure is in her best interests and medically necessary in order to prevent further deterioration or adverse impact upon her mental and emotional condition should said child become pregnant." The petition concludes with the request for the circuit court "to allow said child to undergo a sterilization procedure at the expense of her parents."
*589 The child's guardians ad litem counterclaimed for a permanent injunction to forbid the parents to have their child sterilized. Basically, the assertions made on the child's behalf were that sterilization was not medically necessary to the health of the child and that less drastic means for preventing pregnancy were available.
Four witnesses testified at the hearing: The pediatrician who has treated the child since 1978; a clinical psychologist who examined the child pursuant to a court-ordered examination requested by the guardians ad litem; and the parents of the child. In his memorandum opinion, the circuit judge stated:
"[T]he court is of the opinion that the State of Alabama, through this court or otherwise, may not direct, urge, instruct or order parents of a child to sterilize such child in the absence of an emergency involving great danger to the child. It does not follow that the court cannot define the rights, duties, authorities, and responsibilities of the parents."
The circuit judge then declared:
"As a declaration of rights, this court judicially declares that the petitioners in this case may have said child sterilized; and petitioners will be exercising appropriate parental control and authority to seek and obtain such medical help and assistance as may be required to cause said child to be sterilized. The court judicially declares that under the facts and circumstances of this case, the matter of sterilization and the form it takes, whether permanent or temporary, rests in the sound discretion of the petitioners. The court further declares that any medical personnel, including doctors, nurses, et al., aiding and assisting the petitioners or acting pursuant to their instructions will not incur any liability, per se, in sterilizing said child."

FACTS
The record of the hearing in the circuit court fully supports the judge's findings of fact:
"A. That the child, which is the subject matter of these proceedings is thirteen years of age[[1]] and is severely mentally retarded; further, said child suffers from mental conditions that cause her to inflict substantial injury to herself from time to time and cause her to be unruly, loud and angry. That said child has little, if any, ability to reason, has no judgment of consequence, that said child cannot be educated in any material or substantial way, that said child is incapable of consenting to sexual relations; does not now and will not in the future understand the concept of motherhood, and that said child now and will in the future require constant care and constant supervision to the extent such is possible. That said child requires constant medication to calm said child to some extent and to make her, at least partly, manageable.
"B. That the parents of said child are capable, reasonable people, and have been, and in all probability, will be able to provide for said child during their lifetimes; that they have performed their duties of parenthood in a responsible manner and will, to the extent of their abilities, continue to be responsible and able parents.
"C. That said child is now and will permanently be unable to consent to sexual relations and that any pregnancy will be the result of a criminal act, whereby another has sexual relations with her without her consent.
"D. That due to the severe mental retardation of said child and other mental disabilities and conditions suffered by her, any pregnancy would be greatly dangerous to the physical well-being of said child, in that, the child would not understand that any protection of the fetus is necessary and would, in all likelihood, cause a destruction of or serious injury to the fetus. The conclusion of the court is that a pregnancy would be an unmitigated disaster to the child and *590 would endanger the physical well-being of said child. The court further finds that said pregnancy would be impossible for said child or the parents to manage. The difficulties with which they would be confronted would be almost beyond imagination if there was a bona fide attempt to bring about the safe delivery of a baby. Any pregnancy would, of necessity, have to be aborted for the well-being of the child.
"E. The existing condition of said child will not be substantially changed by future development of the child as there is no realistic hope that the mental condition of said child will improve, or that the child can be taught anything of consequence; hence, the child will remain totally dependent after reaching legal age and will remain the responsibility of her parents.
"F. That said child is physically attractive and is physically bigger and stronger than a normal thirteen-year-old girl. She has no physical deformities."
We note further from the hearing transcript that the child has been examined by several other doctors and psychiatrists. The opinion of the child's pediatrician was that the child suffers from organic brain syndrome and cannot carry on a conversation. A clinical psychologist testified that, based upon his examination of the child, she suffers from an organic brain abnormality. Additionally, he classified one of the child's conditions as autism and, in summation, stated, "I don't see an opportunity for really any further substantial improvement in her cognitive functioning or her adaptive behavior."
The parents testified that the child is often away from them at a special school for three weeks at a time. Because the child is physically attractive and sometimes affectionate to others, the parents fear that someone may have the opportunity to sexually take advantage of her while she is away from home in schools and institutions.
The testimony as to alternative forms of birth control came from the child's pediatrician who stated that, while any of the alternative temporary methods of birth control would be effective, there would be serious problems with any of them. Birth control pills can cause side effects and must be administered on a strict schedule in order to work. While missing a dosage of tranquilizing medication is self-evidencing in the deterioration of the child's behavior, misdosage of birth control pills does not carry such a symptomatic guarantee. An intrauterine device (I.U.D.) should not be left in the uterus for more than several years, and certainly not for the entire period of the child-bearing years. Some individuals cannot tolerate the presence of an I.U.D. and the device can pose a serious health threat in that it can cause severe cramps, uterine infections, and uterine perforations.
Further, stated the pediatrician, this child would, of necessity, have to be put to sleep during the procedure due to her inability to remain still and tolerate the uncomfortable insertion of an I.U.D. He also noted that neither the birth control pill nor the I.U.D. provides absolute safety against conception. Any of the other temporary methods of birth control (e.g., diaphragm and spermicides) are used just prior to intercourse and would be inappropriate because any intercourse involving this child would be "on a spur of the moment ... not really of her free choice." The pediatrician added that this child does not suffer from a genetic abnormality which would result in a deformed offspring should she become pregnant.

THE ISSUE
Two preliminary observations will be helpful in placing in perspective the issue presented for our review: 1) The trial court's three-part order(a) denying the Petitioner's request for an order directing the sterilization; (b) denying the injunction sought by the guardians ad litem; and (c) declaring the rights of the parents to exercise their discretion in the matteralthough declining to direct the requested procedure, authorized the parents to have *591 such procedure performed; and 2) while the "Issues Presented," as stated by the guardians ad litem, make no explicit reference to Part 2 of the trial court's order, the argument section of their brief makes it clear that the trial court's denial of their request to enjoin the parents from having their ward sterilized forms the core of their allegations of error.
Our focus is further sharpened by the respective contentions of the parties. The guardians ad litem cite Hudson v. Hudson, 373 So.2d 310 (Ala.1979), for the proposition that, absent statutory authority, the inherent equity power of the court over both incompetents and minors did not include the power to order surgical sterilization. The parents argue, alternatively, that 1) Hudson's holding is predicated on the absence of any "contention that a surgical procedure is medically necessary or that the failure to authorize sterilization will endanger the [incompetent's] life or health;" and 2) virtually every jurisdiction that has addressed this issue since Hudson has recognized the court's inherent chancery power to authorize the surgical procedure of sterilization of an incompetent under restrictive guidelines.[2] To be sure, insist the parents, the court's intervention is absolutely essential in order to prevent unwarranted sterilization of defenseless incompetents.

ANALYSIS OF THE ISSUE
I would begin my analysis by reaffirming Hudson.[3] The focal point of Hudson is the constitutionally protected private right of the individual to marry and have children. This fundamental right of decision with respect to bearing children is not subservient even to parental rights; and minors whose incompetency is due only to non-age have the absolute right to resort to the courts for its enforcement. Likewise, a competent adult has the unqualified right to choose for herself any form of contraception, including sterilization. (The use of the female gender is not intended as a limitation. I see no reason why the same considerations should not apply, when appropriate, to both male and female incompetents.)
The more difficult question, of course, is the surrogate or substitute decision on behalf of a mentally incompetent person. Hudson answers the question in those situations where there is no showing "that a surgical procedure is medically necessary." That is to say, Hudson stands four-square for the proposition that the parents cannot be authorized to act on behalf of their mentally incompetent minor child absent a showing that "the failure to authorize sterilization will endanger the [incompetent's] life or health." It is apparent that the latter-quoted phrase ("the failure to authorize sterilization will endanger the incompetent's life or health") is but an explanation of the former ("that a surgical procedure is medically necessary").
The ultimate question, then, is: What is the test for determining the right of the parents to act, as surrogates, for the incompetent *592 child?[4] Otherwise stated, assuming that the parents allege that surgical sterilization is medically necessary for the well-being of their mentally incompetent child, what are the guidelines that must be met as a condition to a court order authorizing the parents to proceed as requested?
As a preliminary step in a search for the answer, and at the risk of a certain degree of repetition, I deem it appropriate to make a few observations. I am keenly aware of the seriousness of the decision before us; and, because of the awesomeness of this responsibility, I perforce begin my consideration with the acknowledgement that the right to bear children is "fundamental to the very existence and survival of the race." Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The deprivation of this basic liberty, through unwanted sterilization, is so grave in its consequences to both the individual and society as a whole as to strengthen the court's resolve to protect the individual's right of meaningful choice. But, here, because of her severe mental deficiency, the incompetent cannot exercise either of her constitutional rights; that is, she does not have the ability to choose between sterilization and procreation, or among other methods of contraceptiona choice which, if legally competent, she would presumably make in her best interest.
Query: Should her inability to make a meaningful choice result in the forfeiture of the effective protection of her "best interest"a protection rooted in her right of privacy guaranteed by the Constitution? I approve the answer given by the New Jersey Supreme Court in Matter of Quinlan, 70 N.J. 10, 355 A.2d 647 (1976): "[If the right of choice is] a valuable incident to her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice." Quinlan, at 70 N.J. 41, 355 A.2d 664. I would hold that the effective protection of that right, under the appropriate circumstances of medical necessity, may require the court to assert the right of choice on behalf of the incompetent.
I would propose these applicable standards for determining whether to authorize sterilization.
1. Ultimately, it is the duty of the court, and not the parents, to determine the need for sterilization. As said before, the constitutional right here involved is a right personal to the individual. While the parents' duty of custody, care, and nurture gives rise to their right to advise a child and participate in any decision, a decision relating to reproductive anatomy belongs to the child and not to the parents. I agree with the Supreme Court of Washington when it observed that
"unlike the situation of a normal and necessary medical procedure, in the question of sterilization the interest of the parents of a retarded person cannot be presumed to be identical to those of the child." In re Hayes, 93 Wash.2d 228, 608 P.2d 635, 640 (1980).
2. Where application is made for authorization to sterilize an alleged incompetent person, the court should appoint a guardian ad litem, who must zealously represent the interest of his ward in all appropriate ways.
3. In addition to receiving medical and psychological testimony by qualified professionals offered by the parties, the court, in its discretion, may appoint its own experts to examine the alleged incompetent person, to assist the court in its evaluation of the incompetent's best interest, and to testify at the hearing.
4. Where practicable, as part of the proceedings on the petition, the trial judge should personally meet with the individual and form his own opinion of competency, as well as any other matters relating to the individual's best interest.
*593 5. The trial judge must find that the alleged incompetent is so mentally deficient as to lack capacity to make any decision relating to the sterilization and that such incapacity is total and permanent in nature. Because the trial court must exercise extreme care not to substitute its consent for that of any person capable of making his or her own decision, the proponent of sterilization must bear the burden by proving by clear and convincing evidence that the alleged incompetent lacks the capacity to consent or to withhold consent.
6. The trial court must be persuaded by clear and convincing evidence that sterilization is in the incompetent person's best interest. I would emphasize that a finding of "best interest" requires a specific concomitant finding that a surgical procedure is medically necessary; that is, that the failure to authorize sterilization would endanger the incompetent's life or health. In making this determination, the court should consider at least the following factors:
A) The probability or likelihood that the incompetent person may become pregnant. The court may presume fertility unless the evidence raises doubts.
B) The probability or likelihood that the incompetent person will experience substantial trauma (physical or psychological) if she becomes pregnant or gives birth, and, conversely, the probability or likelihood of such damage from the sterilization procedure.
C) The probability or likelihood that the individual will be subjected to sexual activity by voluntarily engaging in sexual intercourse or be exposed to situations where sexual intercourse is imposed upon the incompetent.
D) The inability of the incompetent person to understand reproduction or contraception and the likely permanence of that inability.
E) The medical advisability and practical feasibility of less drastic means of contraception at the present time and under foreseeable future circumstances.
F) The urgency of sterilization at the present time as opposed to the advisability of the proposed surgical procedure at some time in the future. The court should be cautious to deny authorization unless and until it is persuaded by clear and convincing proof that the proposed sterilization procedure is a medical necessity under all the current circumstances.
G) The ability of the incompetent person to care for a child, either at the present time or at some future time with any degree of reasonable certainty.
H) Reasonable inferences from the evidence that scientific advances may occur which will either make possible improvement of the individual's condition or render feasible alternative and less drastic contraception procedures.
I) A showing that the proponents of sterilization are acting in good faith and that their sole concern is for the best interest of the incompetent person, rather than for their own or the public's convenience.
Other pertinent factors may also be considered, and each should be given appropriate weight as the particular circumstances dictate. The ultimate criterion is the best interest of the incompetent person as I have sought to define that interest; that is, that the failure to authorize sterilization, under all of the circumstances of the particular case, will likely endanger the incompetent person's life or health.
One further observation before I conclude this section of my dissent: None of the several courts that have recognized their inherent power to address this problem have made "medical necessity" the test for determining "best interest." To those who will complain that the "best interest" test which I propose exacts too heavy a burden on the proponent of sterilization, I can only respond that I have done so consciously and purposefully. Because of the grave consequences of the surgical procedure of sterilization, I adhere to the view that courts must exercise their inherent parens patriae jurisdiction in such matters with extreme caution.
*594 It is not my purpose to criticize those courts that have formulated a more liberal set of guidelines; but I am firm in my conviction that, when the law moves into a heretofore unknown arena, as in this case, it is the wisdom of the common law that it make the move slowly and with great deliberation. The court's authorization of one person to exercise a constitutionally granted choice on behalf of another, even when the one is a caring and dutiful parent and the other a severely mentally retarded child who can never exercise that choice for herself, must be given under such stringent standards as to insure, as best it knows how, that any error committed will be committed in denying, as opposed to granting, the petition for sterilization. Yet, consistent therewith, I am just as firm in my resolve that, for the protection of the incompetent's fundamental rights, the court cannot simply step aside and wash its hands of the matter without risking grave violations of these precious rights. Because this Court has declined to act, the legislature, with all deliberate haste, should move into the vacuum and establish the requisite public policy criteria so as to prevent the indiscriminate use of standardless procedures calculated to result in serious and irreversible injury to defenseless incompetents.

THE NECESSITY FOR REMAND
I return now to the trial court's order and test its contents against the above-stated standards. Although it is readily apparent that the trial court's "findings of fact" evince due consideration of many of the herein prescribed factors, and are in substantial compliance with the requisites for determining the best interest of the incompetent child, it is likewise apparent that in one particular aspect the thrust of the trial court's order is at variance with the central theme of this dissenting opinion. Furthermore, I would opine that to the extent that its authorization is grounded on the rights of the parents and not focused solely on the rights of the incompetent, whose sterilization is in issue, the trial court's order cannot be permitted to stand.
Thus, I would remand this cause to the circuit court for reconsideration, utilizing the "clear and convincing" standard of persuasion in evaluating the evidence and utilizing the above-prescribed guidelines in determining the "best interest" of the incompetent, as herein defined. I would further provide that the order of remand be without prejudice to the rights of the parties to appeal from the final judgment entered by the trial judge upon remand of this cause.
FAULKNER, J., concurs.
NOTES
[1] The child has had her fourteenth birthday since the date of the entry of the court's order.
[2] A partial list of subsequent cases includes In re Nilsson, 122 Misc.2d 458, 471 N.Y.S.2d 439 (1983); In re Moe, 385 Mass. 555, 432 N.E.2d 712 (1982); In re Terwilliger, 304 Pa.Super. 553, 450 A.2d 1376 (1982); Brode v. Brode, 278 S.C. 457, 298 S.E.2d 443 (1982); In re Grady, 85 N.J. 235, 426 A.2d 467 (1981); In re Johnson, 45 N.C.App. 649, 263 S.E.2d 805 (1980); In re Hayes, 93 Wash.2d 228, 608 P.2d 635 (1980); and In re Penny N., 120 N.H. 269, 414 A.2d 541 (1980).

Although In re Gradya well-reasoned, well-written opinionestablishes a more liberal "best interest" test, from the standpoint of the proponent of sterilization, than the standards I propose in this dissenting opinion, I have adopted much of its rationale. I particularly commend the Grady court for its excellent historical account of the evolution of cultural attitudes toward, and society's frequent abuse of, the practice of sterilization of mentally incompetent and disabled persons.
[3] For the sake of clarity, it should be noted here that I do not disagree with the majority's interpretation of Hudson. Because the legislature has not interceded in these matters, the majority is effectively extending the application of Hudson `s holding in the instant context in which the parents allege and prove "medical necessity"a missing component in Hudson.
[4] This reference to "right of the parents to act" is used in the context of the instant case in which the parents are the petitioners, seeking sterilization. It is not necessary here, particularly by way of a dissenting opinion, to discuss the range of persons who may petition for authorization to act on behalf of an incompetent.