SIXTH DIVISION
April 18, 2008

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

| | | |
|---|---|---|
| *In re* ESTATE OF K.E.J., a Disabled Person | ) | Appeal from the |
| | ) | Circuit Court of |
| (V.H., | ) | Cook County, Illinois. |
| | ) | |
| Petitioner-Appellant, | ) | No. 96 P 11118 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| K.E.J., | ) | James Riley |
| | ) | Judge Presiding. |
| Respondent-Appellee). | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Guardian V.H. petitioned the court below to allow involuntary sterilization of her ward K.E.J., a 29-year-old mentally disabled woman, by means of a tubal ligation.[1]  The court denied the petition, ruling that V.H. had not sufficiently demonstrated that a tubal ligation was in K.E.J.'s best interests.

The three key issues raised in this appeal are as follows: (1) whether the trial court erred in denying V.H.'s petition to have K.E.J. undergo tubal ligation; (2) whether it was proper for the trial court to award V.H. attorney fees for the trial proceedings out of K.E.J.'s estate, and whether we have jurisdiction to consider this issue; and (3) whether it was proper for the trial court to deny attorney fees for the appellate proceedings.  For the reasons that follow, we affirm on the first issue, affirm the denial of appellate fees, and remand on the issue of trial fees.

---

[1] To help keep the identity of K.E.J. from being revealed, we are referring to her guardian by her initials only, and we are omitting the surname of her father.

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

I. BACKGROUND

On May 28, 1986, when K.E.J. was eight years old, she sustained severe head trauma in a car accident. The ensuing personal injury lawsuit was settled, and K.E.J. received $750,000 in cash, as well as a structured settlement annuity which had a guaranteed payout of $4,485,405.88 and which was expected to pay as much as $14,418,036.24 over her lifetime.

Due to the brain damage K.E.J. sustained in the accident, she has since been adjudicated to be a disabled person. V.H., her maternal aunt, was appointed as the guardian of K.E.J.'s person, in a decision which we subsequently affirmed. K.E.J. currently resides with V.H..

On January 9, 2003, V.H. petitioned the court to authorize a tubal ligation for K.E.J., who was then 24 years old. She alleged that K.E.J. was sexually active despite V.H.'s efforts to deter her, but that K.E.J. was unable to comprehend the possibility of pregnancy or handle the responsibility that it would bring. She further stated that K.E.J. was currently on Depo Provera injections for contraception, but that these injections caused weight gain, elevated blood pressure, and other negative side effects. In support of her petition, she attached statements from K.E.J.'s doctors and counselors stating that a tubal ligation was the optimal means of preventing K.E.J. from becoming pregnant under the circumstances.

Probate lawyer Mary J. Raleigh has been K.E.J.'s guardian *ad litem* since 1996, and in the time period leading up to the hearing, she met with K.E.J. on multiple occasions to keep the court appraised of K.E.J.'s status. In her report dated February 4, 2003, Raleigh stated that K.E.J. was involved with a man named David Hence whom she called her fiancee and wished to marry. Subsequently, on February 14, 2005, Raleigh met with K.E.J. to discuss the pending petition for

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

tubal ligation. According to Raleigh, K.E.J. told her that she wished to have a baby and that she understood the contraceptive purpose of tubal ligation as well as its permanence; as a result, Raleigh said, "There is no doubt in my mind that [K.E.J.] does not want the tubal ligation procedure." K.E.J. said that she had previously agreed to the procedure because she was with V.H. and knew that V.H. wanted the procedure done. K.E.J. was then on the Ortho Evra contraceptive patch, about which she claimed to have no problems; however, Raleigh expressed concern that due to her obesity (K.E.J. weighed over 200 pounds at the time), the patch might not be fully effective as a means of contraception.

Before the trial, V.H.'s counsel filed a petition requesting that attorney fees be paid out of K.E.J.'s estate, both for past services rendered and prospective fees to be incurred. On May 11, 2005, K.E.J.'s counsel filed an objection to any such award of fees, arguing that no fees should be granted for anything relating to the petition for tubal ligation because K.E.J. was unwilling to undergo the procedure and thus it was not in her best interest.

That same day, the court held a hearing on V.H.'s fee petition. A representative of South Suburban Bank & Trust, the guardian of the estate, testified that as of that date, the value of the estate had been reduced to $225,000 in cash and investments plus a house worth $100,000, as well as approximately $60,000 a year in annuity payments and further payments of $50,000 every five years. Raleigh, the guardian *ad litem*, strongly opposed V.H.'s fee petition: "This is a very small estate for a very young person," she said, "and if we are all granted our customary hourly rate, this small estate will be even smaller." She thus argued that it was in K.E.J.'s best interest that the fee award be reduced. After hearing arguments from both sides, the court chose to grant

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

V.H.'s fee petitions, awarding $21,000 in back fees and $3,000 in prospective fees. It stated that as this was a medical matter, V.H. "had a right to bring it to court," and that it would be unfair to essentially force her lawyers into working *pro bono* by denying fees. K.E.J.'s counsel filed a motion to reconsider the fee award on June 3, 2005, but that motion was denied.

The court conducted a bench trial during June and July of 2005. Because the transcript is disorganized and nonchronological, the compilation of a full chronological sequenced account of the trial has been difficult.

V.H.'s first witness was K.E.J. K.E.J. said that she knew that she was in court because V.H. wanted her to get a tubal ligation, and that she understood that the procedure worked by tying the Fallopian tubes so that no eggs could pass through. However, she said that she did not want a tubal ligation. Instead, she wanted to have two children when she was married to a husband who would support her and help her take care of them. "I want to have children," she said, "because they are – I will love taking care of them, I will love, you know, to see how they grow and stuff, you know, just – just all the things that, you know, any person would want to have a child." Furthermore, she said that she feared having to go under general anesthesia if she were to undergo tubal ligation.

K.E.J. also said that she had sex with her previous boyfriend, Hence, but that he did not always wear a condom despite her urging him that "you have got to, cause otherwise you can get me pregnant." Although V.H. has disapproved of her sexual activities in the past, K.E.J. told the court that "I guess I need a little freedom." She said that she was currently on the patch for contraception. According to her, the patch had fallen off in the past due to her being a wild

-4-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

sleeper; when that happened, she told V.H., who put a new one on her.

V.H. thereafter testified in support of her petition. Regarding K.E.J.'s relationship history, V.H. said that in 1999, K.E.J. believed (incorrectly) that she had been impregnated by a man named Efrom and that they were going to get married and have 10 children – despite Efrom's statements to V.H. that he "didn't know anything about it" and that they had no relations. Subsequently K.E.J. became involved with Hence, a paranoid schizophrenic 20 years her senior. She wanted to be married to him, over V.H.'s objections, and told people that they were engaged. However, the two of them broke up; K.E.J. has since then been through a string of other boyfriends and continues to be sexually active.

V.H. initially had K.E.J. placed on Depo Provera contraceptive injections. However, once this treatment started, K.E.J. gained weight from 134 pounds to 184 pounds, and she also experienced hair loss. Over a year ago, V.H. began taking K.E.J. to see Dr. Anjum Hameeduddin, who was referred to her as a gynecologist. Dr. Hameeduddin took K.E.J. off Depo Provera and started her on the Ortho Evra contraception patch. The patch is placed on K.E.J.'s back every three weeks, then remains off a week; V.H. said that there had been no problems with the patch falling off, contrary to K.E.J.'s testimony, and there were no negative side effects.

V.H. nevertheless said that she believed that a tubal ligation was in K.E.J.'s best interests because it would be permanent and effective, it would be healthier than taking contraceptive medication (since K.E.J. was already on a variety of other medications due to her condition), and if K.E.J. were to become pregnant, she could not rely on any family members for help and support

-5-

except for V.H.. On cross by K.E.J.'s counsel, she admitted that in her deposition, another reason she gave for supporting a tubal ligation was that it would be "easy maintenance."

V.H. also called various doctors and professionals to testify to K.E.J.'s condition. The first of these was Eric Larson, a clinical neuropsychologist, which is a specialty that studies the effects of brain damage. Based on an examination of K.E.J. in September 2004, he said that K.E.J. was unable to make decisions about personal and financial matters, including whether to have a tubal ligation, and that her cognitive condition was unlikely to improve. He also stated that if she were to become pregnant, she would have to discontinue her psychiatric medicines, which might cause her to endanger herself and her family. However, on cross, he admitted that he was not a physician and that a physician would be in a better position to determine if such medicines would have to be discontinued.

V.H. also called Dr. Hameeduddin to testify. Dr. Hameeduddin said that she was a board-certified family physician whose practice included gynecological services and birth control. On cross by K.E.J.'s counsel, she explained that she is not a gynecologist (despite providing some basic related services), and that if she were to recommend tubal ligation for a patient, she would refer the patient to a gynecologist to perform the actual procedure.

Dr. Hameeduddin testified on direct examination that she first saw K.E.J. as a patient in November 2003. At that time, she switched K.E.J.'s method of contraception from Depo Provera injections to the Ortho Evra patch, which works by releasing hormones into the body to prevent pregnancy. On cross by Raleigh, she said that research shows that the patch is not as effective on women weighing over 198 pounds, while K.E.J. weighed 204 pounds at their last

appointment. However, on cross by K.E.J.'s counsel, she said that she believed the patch would be effective as long as K.E.J. were to lose weight. She also testified that she had not heard any reports that the patch was ineffective on K.E.J. or that K.E.J. refused to comply with its use.

With respect to alternate methods of contraception, Dr. Hameeduddin spoke at length regarding the possibility of an intrauterine device (IUD), which is a device placed inside the uterus. She never considered one for K.E.J. during her discussions with V.H., she said, because "it just didn't come up." Each one lasts for three to seven years before replacement becomes necessary. Risks of IUD installation include bleeding, cramps, pain, and infection. In addition, on cross by the judge, Dr. Hameeduddin said that it would be possible for K.E.J. to pull the IUD out, especially during the first few months after implantation.

During cross, K.E.J.'s counsel questioned her regarding a hormone-based method of contraception called Implanon, but Dr. Hameeduddin said that she was not familiar with it.

Dr. Hameeduddin also stated during cross by K.E.J.'s counsel that tubal ligation is a major surgery requiring general anesthesia. While she did not know the percentage of tubal ligations that could successfully be reversed, she said that she would recommend exhausting all other methods of contraception before proceeding to a tubal ligation.

The final witness for V.H. was Ralph Pollaro, the founder and director of Empowerment Plus, an organization which provides training and education for people with developmental and cognitive disabilities. Pollaro held a master's degree in pastoral studies with some emphasis in counseling and was also in the process of getting a master's degree in psychology and counseling, but on cross he stated that he was not a psychologist. He counseled K.E.J. from spring 2001 to

early 2004 on "appropriate social skills and relationship development."

Pollaro testified that K.E.J. sought greater independence in her life: she wanted to get married, move out, and have a child. He also said that she understood that intercourse leads to pregnancy, and that contraception prevents pregnancy. Nevertheless, he opined that it was advisable for her to get a tubal ligation. Despite her understanding of contraception, he said that she had poor impulse control, so he believed that she would be likely to engage in unprotected sex if a man whom she liked wanted sex with her but had no condom available. Furthermore, due to her cognitive disability, Pollaro said that she could not handle the responsibility of rearing a child. He had observed that she did not deal well with life changes and was prone to severe anxiety, which having a child would surely induce.

At the close of V.H.'s case, the judge conducted a 40-minute interview of K.E.J. in his chambers with no court reporter or counsel present. (K.E.J.'s counsel objected strenuously to this procedure, calling it "inherently coercive"; the judge responded that perhaps K.E.J.'s counsel were the coercive ones.) Once the interview was over, the judge called in the court reporter, and K.E.J. said on the record: "I will consent with a – to a tubal ligation."

Based on this interview as well as K.E.J.'s prior testimony, the judge found that because of K.E.J.'s cognitive deficits, she was unable to make the decision about whether or not to consent to a tubal ligation. He observed that she had changed her mind more than once regarding the procedure. Thus, despite her statements at trial, a tubal ligation was not against her will; rather, "she doesn't have the ability to make up her will." The judge made clear that he took K.E.J.'s statements during the interview not as consent *per se*, but merely as further evidence of

-8-

her lack of capacity to consent.

Counsel for K.E.J. called K.E.J.'s father, Eric J., to the stand. Eric testified that the past four times he had talked with K.E.J. about a tubal ligation, including that very morning, she had told him that she did not want one. However, he concluded that she was easily swayed by authority and could be made to assent to something she did not truly agree to.

Eric stated that he was opposed to a tubal ligation because knowing that she could never have children would probably cause K.E.J. to enter severe depression: "[W]e take [her desire to raise a child] and crush it and take her whole wish and fantasy totally away." Therefore, he said that it was preferable that she remain on temporary contraceptives, which had been satisfactory thus far and which allowed her to preserve her dream (even if it were never to be realized). He also stated that if K.E.J. were to bear a child, having it taken away would be highly traumatic for her, but in fact it would not need to be taken away because he would help take care of it.

K.E.J.'s counsel also called gynecologist Dr. Cassing Hammond to the stand. Although he had not personally examined or met K.E.J., based on his review of various documents explaining the facts of the case, Dr. Hammond testified that a tubal ligation was not appropriate because other forms of contraception had not been fully explored. He expressed concern that K.E.J. showed ambivalence toward a tubal ligation and might therefore experience problems with postoperation regret. He also stated that only 50% to 80% of tubal ligations could be successfully reversed.

Dr. Hammond testified that he had experience in prescribing "virtually all" forms of contraception available in the United States, and he was familiar with the alternatives to tubal

ligation. First, he said that K.E.J. would be an "excellent candidate" for an IUD, which would be as least as effective as a tubal ligation. IUDs are inserted during an office visit; the procedure takes around 15 minutes and generally requires no sedation, though on cross, Dr. Hammond acknowledged that patients with cognitive disabilities might require sedation so that they would remain still during insertion. He also stated that it would be extremely difficult for a patient to reach in and remove an IUD unless the body started to expel the IUD on its own.

Second, Dr. Hammond spoke of the possibility that K.E.J. could be placed on Implanon, a subdermal implant consisting of a small rod placed under the skin which releases hormones to prevent pregnancy. Implantation of the device, which Dr. Hammond said he had been trained to perform, requires a local anesthetic but no sedation. As of the time of the trial, Implanon had not yet been approved by the Food and Drug Administration for use in the United States, and on cross Dr. Hammond said that it was unknown if and when it would be approved; however, he said that he expected it to be approved, since it was available for use in Europe. Dr. Hammond also testified that he was having lunch with a representative of Implanon's manufacturer the following week to discuss when it would be approved.

Subsequent to the hearing, in a nonfinal order dated August 11, 2005, the court stated that the following had been shown by clear and convincing evidence: First, it found that K.E.J. lacked capacity to make a decision regarding tubal ligation and that "the incapacity is not likely to change in the foreseeable future." Second, it found that K.E.J. was capable of reproduction, since she had matured normally into a healthy woman and no evidence had been introduced regarding her lack of fertility. Third, it found that K.E.J. was sexually active. Fourth, it found that

according to the uncontradicted testimony of many witnesses, K.E.J. "could never conceivably carry out parenting duties," and that having a child taken away from her would result in "irreparable psychological damage." Thus, the court reached the following conclusion: "[I]t is not in [K.E.J.'s] best interest to become pregnant and as a result of that finding this court believes that by clear and convincing evidence that it is in [K.E.J.'s] best interest to have a permanent form of birth control." Nevertheless, the court went on to state that "there is no evidence in the record, which would support a finding that a less intrusive method of contraception would not serve her needs." It therefore ordered that K.E.J. be examined by a board-certified gynecologist and a written report from that gynecologist be presented to the court on whether K.E.J.'s contraceptive needs could be appropriately served through use of an IUD or Implanon.

On September 15, 2005, V.H. filed a petition for $69,958.47 in attorney fees. K.E.J.'s counsel objected, arguing that the fee request was "unconscionable" given the modest size of the estate, and repeating their argument that V.H.'s actions in pursuit of the petition were not in K.E.J.'s best interest. Nevertheless, the court granted the petition on September 22, 2005, in the modified amount of $63,553.47. The court also awarded $22,708.75 in attorney fees to Raleigh. K.E.J.'s counsel filed a motion to reconsider the award of fees to V.H.'s counsel on October 21, 2005, noting that according to testimony of estate guardian representative Carol McMahan, payment of such fees would leave the estate with less than $200,000 in liquid assets. However, that motion was denied.

On July 13, 2006, the court held a status hearing on the petition. Pamela Chwala, who had been court appointed as K.E.J.'s case manager in a prior probate proceeding, stated that

K.E.J. was currently using birth control pills and that they were working well. She explained that in April, K.E.J. had a gynecological appointment with a Dr. Axelrod, who had suggested use of the pill:

> "He opposed the patch because it has caused weight gain. He opposed the double injection because it has caused weight gain. He opposed the IUD because of risk of infection, especially if there are multiple partners. *** But if she has adults there who tell her take the pill, that's really the best option and that hasn't been tried for a while; I think we should try it."

Raleigh also confirmed that K.E.J.'s use of the pill had been successful so far, and she opined that if K.E.J. were to be supervised closely, the pill provided adequate protection from an unwanted pregnancy.

After hearing this testimony, the judge stated that he did not intend to vilify V.H., whom he believed had always been looking out for K.E.J.'s best interests; nevertheless, he said that K.E.J. was "doing okay" and that there was no need at present for a permanent form of birth control. That same day, the court entered its final order denying V.H.'s petition for tubal ligation. The order did not mention the earlier awards of fees from the estate.

V.H. timely filed a petition for leave to appeal on August 9, 2006. On August 14, 2006, K.E.J.'s counsel filed a postjudgment motion pursuant to section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2006)), challenging the prior awards of fees to V.H.'s counsel and further requesting that no fees be granted for appellate proceedings. (They do not challenge the court's award of fees to Raleigh.) In support, they stated that V.H. had spent a

total of approximately $111,000 of the estate funds in pursuit of her petition for tubal ligation, leaving the estate with only $114,000 in liquid assets, and they argued that the court had erred in allowing such drastic depletion of the estate.

In an order dated September 26, 2006, the court ruled that funds for the appeal would not be provided out of the estate and furthermore stated that the fee ruling was final and appealable. V.H. appealed the ruling with respect to the appellate fees. In addition, on January 11, 2007, the court issued an order denying K.E.J.'s postjudgment motion. K.E.J.'s counsel appealed this decision on February 2, 2007. Both of these fee-related appeals have been consolidated with the current case.

## II. ANALYSIS

### A. Denial of the Petition for Tubal Ligation

On appeal, V.H. argues that the trial court erroneously denied her petition for tubal ligation, since she showed by clear and convincing evidence that a tubal ligation was in K.E.J.'s best interests. For the reasons discussed below, we disagree. Instead, we find that the court correctly applied the best interests standard and that V.H. did not meet her heavy burden of proof in demonstrating that a tubal ligation would serve K.E.J.'s best interests.

As this is a case of first impression in Illinois, we must look to the basic rights and interests that have to be considered and balanced in determining the standard which must govern our disposition.

### 1. Fundamental Privacy Rights at Stake

There are two distinct privacy rights at stake in this case, as well as in all cases involving

-13-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

involuntary sterilization of an adult ward: the right to bear children, and the right of personal inviolability.

The first and most prominent right that is implicated by these proceedings, the right to procreation, has been described by the United States Supreme Court as "one of the basic civil rights of man." *Skinner v. Oklahoma*, 316 U.S. 535, 541, 86 L. Ed. 1655, 1660, 62 S. Ct. 1110, 1113 (1942) (invalidating a law providing for forced sterilization of habitual criminals). The *Skinner* Court goes on to say:

> "Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, farreaching and devastating effects. In evil or reckless hands it can cause races or types which are inimical to the dominant group to wither or disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty." *Skinner v. Oklahoma*, 316 U.S. at 541, 86 L. Ed. at 1660, 62 S. Ct. at 1113.

Although the statutory scheme in *Skinner* was far different from the one we deal with today, these words of the *Skinner* Court still serve as a warning for us to proceed with caution: to the extent that the sterilization methods being contemplated are permanent, they deserve careful scrutiny, because any judicial mistake is to the "irreparable injury" of the ward required to undergo such a procedure. Moreover, there is the danger that state-sanctioned involuntary sterilization may be abused as a means of a policy of eugenics (although the instant case does not technically raise this specter, because K.E.J.'s mental deficiencies resulted from trauma rather than genetic causes).

-14-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

Since *Skinner* was decided, there has been a line of United States Supreme Court cases declaring that the right of self-determination in deciding whether or not to have a child is so fundamental that it is protected as part of the individual's right of privacy under the United States Constitution. See, *e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438, 453, 31 L. Ed. 2d 349, 362, 92 S. Ct. 1029, 1038 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child" (emphasis omitted)); accord *Roe v. Wade*, 410 U.S. 113, 152, 35 L. Ed. 2d 147, 176, 93 S. Ct. 705, 726 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 485-86, 14 L. Ed. 2d 510, 515-16, 85 S. Ct. 1678, 1682 (1965); *Carey v. Population Services International*, 431 U.S. 678, 685, 52 L. Ed. 2d 675, 684-85, 97 S. Ct. 2010, 2016 (1977).

The second right implicated by involuntary sterilization is the fundamental right to keep one's person inviolate from unwanted intrusions. "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251, 35 L. Ed. 734, 737, 11 S. Ct. 1000, 1001 (1891) (holding that the trial court could not compel plaintiff in a personal injury lawsuit to submit to an examination by defendant's physician). Thus, the general rule is that a patient must consent to medical treatment of any kind. *In re Estate of Longeway*, 133 Ill. 2d 33, 44, 549 N.E.2d 292, 297 (1989); *Pratt v. Davis*, 224 Ill. 300, 305, 79 N.E. 562, 564 (1906) (informed consent is necessary for surgery).

-15-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

However, neither of these rights is absolute, especially when they are confronted by the right of a parent or guardian with respect to a minor or someone who has been adjudicated an incompetent. For instance, in the area of reproductive rights, the United States Supreme Court upheld a state abortion law's parental consent requirement for unemancipated minors, based on the presence of a judicial bypass procedure which allowed courts to authorize abortions for minors who gave informed consent or who could show the procedure was in their best interests. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 899, 120 L. Ed. 2d 674, 729, 112 S. Ct. 2791, 2832 (1992); see also *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 111 L. Ed. 2d 405, 110 S. Ct. 2972 (1990). The necessary implication of this ruling is that, if a minor is judged not to be able to give informed consent, then under some circumstances, her parents may constitutionally exercise control over her decision about whether or not to bear a child. This is highly analogous to cases such as the present one, where a mental incompetent lacks the maturity or the cognitive capacity to make personal decisions regarding reproduction: the guardian's role as caretaker may supersede the constitutional rights at issue, as long as the ward's best interests are satisfied. The United States Supreme Court explains the reasoning behind these limitations as follows: "The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors." *Bellotti v. Baird*, 443 U.S. 622, 637, 61 L. Ed. 2d 797, 809-10, 99 S.Ct. 3035, 3045 (1979) (plurality opinion) (considering a parental notification requirement in an abortion law).

Similarly, with respect to the right of personal inviolability, it is a well established legal

-16-

fact that in the majority of circumstances, a parent can give binding consent to medical treatment for a child. See 410 ILCS 210/2 (West 2006) (providing that "[a]ny parent *** may consent to the performance upon his or her child of a medical or surgical procedure").

Nevertheless, even if rights of minors and mental incompetents may be superseded in certain cases, courts still have a duty to ensure that parents and guardians of incompetents do not abuse their powers to the detriment of their charges. Courts can override the will of parents and guardians to assert fundamental rights of children and wards which cannot be preempted. See 61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers* §160, at 272-73 (2002) ("A person's fundamental right to determine the scope of his own medical treatment and to refuse medical treatment is not lost if the patient becomes incompetent"; hence, "medical treatment may not be administered without adequate and judicially supervised protection"). Such judicial intervention is justified under the doctrine of *parens patriae*, in the state's capacity as the provider of protection for those who are unable to care for themselves. See *In re Terwilliger*, 304 Pa. Super. 553, 560, 450 A.2d 1376, 1380 (1982) (finding that the state "has the right and the duty to act to protect its weaker members"). Thus the Supreme Court of New Jersey has said, in a case similar to the one at hand, "The right to choose among procreation, sterilization and other methods of contraception is an important privacy right of all individuals. Our courts must preserve that right. Where an incompetent person lacks the mental capacity to make that choice, a court should ensure the exercise of that right on behalf of the incompetent in a manner that reflects his or her best interests." *In re Grady*, 85 N.J. 235, 252, 426 A.2d 467, 475 (1981). This conclusion is also consistent with the provisions of the Probate Act of 1975 (Probate Act), discussed more fully

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

below, which requires the decision of any guardian to conform closely to what the ward would have wanted or intended to do under similar circumstances if competent, or to the ward's best interests. 755 ILCS 5/1-1 *et seq.* (West 2006); see *In re Estate of Wellman*, 174 Ill. 2d 335, 347, 673 N.E.2d 272, 278 (1996) ("The guardian only acts as the hand of the court and is at all times subject to the court's direction in the manner in which the guardian provides for the care and support of the disabled person").

Hence, we have a responsibility to implement strong procedural and substantive safeguards for all cases in which a guardian petitions the court to authorize sterilization of a minor or, as in this case, an adult disabled ward. All means of contraception, if they are not consented to by the ward, function as a restriction on the fundamental personal rights of reproductive freedom and personal inviolability. Furthermore, tubal ligation is a particularly drastic means of preventing a mentally incompetent ward from becoming pregnant, because it undercuts both of these rights so deeply.

With respect to reproductive rights, not only is tubal ligation a long-term means of preventing pregnancy, but evidence at trial indicated that it is irreversible in a significant proportion of women. Thus it is far more restrictive than other methods of contraception which could simply be discontinued or removed in the event that K.E.J. were to someday develop the capacity to adequately raise a child. However, it is worth noting that having K.E.J. undergo tubal ligation is no more invasive of her reproductive rights than it would be to keep her on various other forms of contraceptives for the rest of her fertile years; either way, any desire she has to bear children is thwarted. To put it another way, the alternate contraceptive methods discussed at

-18-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

trial – birth control pills, the patch, Implanon – only represent a less severe restriction of K.E.J.'s reproductive rights to the extent that they are someday ended.

Tubal ligation is also a severe imposition on the right to personal inviolability, more so than other methods of contraception that may be imposed, because it is an invasive procedure that requires general anesthesia. This concern is particularly pertinent to the current case, since K.E.J. testified that she feared being placed under anesthesia.

This is not to say that a court order authorizing an involuntary tubal ligation for a mental incompetent is a constitutional violation *per se*; nevertheless, because it is such a severe restriction of such fundamental rights, it deserves careful scrutiny by courts.

*2. Guidelines For When a Sterilization Petition May Be Authorized*

While this is a case of first impression in Illinois, there are decisions of other states regarding involuntary sterilization of mental incompetents that may serve as useful guidelines. See, *e.g*, *Terwilliger*, 304 Pa. Super. at 564, 450 A.2d at 1382; *Grady*, 85 N.J. 235, 426 A.2d 467; *In re Guardianship of Hayes*, 93 Wash. 2d 228, 234, 608 P.2d 635, 640 (1980).

"[I]n making the decision of whether to authorize sterilization, a court should consider only the best interest of the incompetent person, not the interests or convenience of the individual's parents, the guardian, or of society." *Terwilliger*, 304 Pa. Super. at 564, 450 A.2d at 1382, citing *Grady*, 85 N.J. 235, 426 A.2d 467. Furthermore, it cannot be assumed that the interests of a parent or guardian seeking sterilization are identical to those of the mental incompetent. *Hayes*, 93 Wash. 2d at 234, 608 P.2d at 640 (1980).

In order to prevail, the petitioner must prove that sterilization is in the best interests of the

-19-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

incompetent by clear and convincing evidence. *Terwilliger*, 304 Pa. Super. at 564, 450 A.2d at 1382; see also *Hayes*, 93 Wash. 2d at 237, 608 P.2d at 640. This high standard of proof is necessary because of the fundamental rights at stake in sterilization cases, and our "overriding concern to prevent any abuse of judicial authority." *Terwilliger*, 304 Pa. Super. at 565, 450 A.2d at 1382.

Procedurally, the *Terwilliger* court required the following safeguards to be implemented: First, the court must appoint a guardian *ad litem* to represent and defend the ward's interests, if the ward does not already have one. Second, there must be a full judicial hearing, at which both the petitioner and the guardian *ad litem* have the opportunity to present evidence and cross-examine witnesses. Third, the court has a duty to ensure that the ward undergoes a full medical and psychological evaluation, with particular attention paid to the ward's decisionmaking capacity with respect to the proposed sterilization. *Terwilliger*, 304 Pa. Super. at 565-66, 450 A.2d at 1383. The judge should also meet personally with the ward in order to observe firsthand her condition and gauge her level of mental functioning.

Based upon this evaluation and upon the evidence presented during the hearing, the judge must explicitly make the finding that the ward lacks the capacity to make a decision regarding sterilization and that the ward is unlikely to regain such capacity. This finding is needed because even if the individual has been adjudicated a mental incompetent, it does not necessarily follow that he or she is incapable of making a choice regarding sterilization.

Only if these procedural safeguards are met would the court move on to substantive analysis of the petition. The *Terwilliger* court found that in order for sterilization to be in a

ward's best interests, it must be shown by clear and convincing evidence that the sterilization procedure being petitioned for "is the least significant intrusion necessary to protect the interests of the individual"; that is, less drastic contraceptive means are impractical and unworkable under the circumstances. *Terwilliger*, 304 Pa. Super. at 566, 450 A.2d at 1383; see also Hayes, 93 Wash. 2d at 237, 608 P.2d at 641. Pursuant to the foregoing considerations, the court set forth the following six factors to be considered in discerning the ward's best interests:

"(2) The possibility that the incompetent person will experience trauma or psychological damage if she becomes pregnant or gives birth, and, conversely, the possibility of trauma or psychological damage from the sterilization operation.

(3) The likelihood that the individual will voluntarily engage in sexual activity or be exposed to situations where sexual intercourse is imposed upon her.

(4) The inability of the incompetent person to understand reproduction or contraception and the likely permanence of that inability.

* * *

(7) The ability of the incompetent person to care for a child, or the possibility that the incompetent may at some future date be able to marry and, with a spouse, care for a child.

(8) Evidence that scientific or medical advances may occur within the foreseeable future which will make possible either improvement of the individual's condition or alternative and less drastic sterilization procedures.

(9) A demonstration that the proponents of sterilization are seeking it in good faith

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

and that their primary concern is for the best interests of the incompetent person rather than their own or the public's convenience.' " *Terwilliger*, 304 Pa. Super. at 567, 450 A.2d at 1383, quoting *Grady*, 85 N.J. at 264, 426 A.2d at 483.

See also *Hayes*, 93 Wash. 2d at 239, 608 P.2d at 641 (articulation of a similar standard). These are not intended as rigid elements, nor are they intended to be an exhaustive list; rather, they are to guide the court as it seeks to decide whether sterilization by the petitioned-for method is truly the best way to serve the interests of the ward.

We find that the multifaceted concerns regarding the best interests of the mental incompetent are fully reflected in the standards under *Terwilliger*. We therefore adopt the *Terwilliger* standards as outlined in the foregoing six-factor test, subject to the requirements of the Probate Act.

While Illinois has no statute that specifically governs sterilization of mentally handicapped individuals, cases such as the present one are governed by the Probate Act (755 ILCS 5/1-1 *et seq.* (West 2006)). The Probate Act defines the duties of guardians for disabled adults as follows:

"To the extent ordered by the court and under the direction of the court, the guardian of the person shall have custody of the ward and the ward's minor and adult dependent children; shall procure for them and shall make provision for their support, care, comfort, health, education and maintenance, and professional services as are appropriate ***. The guardian shall assist the ward in the development of maximum self-reliance and independence." 755 ILCS 5/11a-17(a) (West 2006).

The Probate Act goes on to set standards for decisions that are to be made on behalf of disabled

-22-

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

adults.

> "Decisions made by a guardian on behalf of a ward may be made by conforming as closely as possible to what the ward, if competent, would have done or intended under the circumstances, taking into account evidence that includes, but is not limited to, the ward's personal, philosophical, religious and moral beliefs, and ethical values relative to the decision to be made by the guardian. Where possible, the guardian shall determine how the ward would have made a decision based on the ward's previously expressed preferences, and make decisions in accordance with the preferences of the ward. If the ward's wishes are unknown and remain unknown after reasonable efforts to discern them, the decision shall be made on the basis of the ward's best interests as determined by the guardian. In determining the ward's best interests, the guardian shall weigh the reason for and nature of the proposed action, the benefit or necessity of the action, the possible risks and other consequences of the proposed action, and any available alternatives and their risks, consequences and benefits, and shall take into account any other information, including the views of family and friends, that the guardian believes the ward would have considered if able to act for herself or himself." 755 ILCS 5/11a-17(e) (West 2006).

Thus, the law sets up a dual standard to be applied in situations where guardians of disabled adults must make decisions for their wards, such as the decision currently before us. First, guardians are to apply a substituted judgment standard, where they attempt to discern what the ward would have wished if she were competent, and then substitute that judgment for their own. See, *e.g.*, *In re Estate of Greenspan*, 137 Ill. 2d 1, 558 N.E.2d 1194 (1990) (guardian had

standing to seek removal of artificial life support for ward in a permanent vegetative state, when testimony established that the ward would likely have refused such treatment if competent). If there is clear and convincing evidence to demonstrate the course of action that the ward would have taken if competent, then those wishes take precedence over any best interests analysis. *Greenspan*, 137 Ill. 2d at 18, 558 N.E.2d at 1202. However, if the guardian is unable to determine such wishes "after reasonable efforts to discern them," then the guardian should instead act to further the ward's best interests. 755 ILCS 5/11a-17(e) (West 2006).

Hence, we adopt the following substantive standards in determining whether sterilization of a mental incompetent is appropriate. In accordance with the mandate of the Probate Act as discussed above, we begin with a substituted judgment standard; then, if that fails to produce clear results, we instead move to consider the best interests of the ward. See 755 ILCS 5/11a-17(e) (West 2006). We also note that while the instant case concerns a female ward, the standards would remain the same in a case involving a male ward.

First, the party seeking sterilization may demonstrate by clear and convincing evidence that the ward, if competent, would have wished to be sterilized and would not have objected to the chosen method of sterilization. If the party seeking sterilization can meet this burden after all procedures have been followed and all relevant evidence has been taken into account, then the court may issue an order authorizing sterilization of the ward.

The party opposing sterilization can attempt to produce clear and convincing evidence that if the ward were competent, she either (1) would not have wished to be sterilized if she could have foreseen her current situation, or (2) would not have consented to the chosen method of

sterilization. If either of these things can be demonstrated, then following the substituted judgment standard provided for in the Probate Act, the ward's wishes prevail and the court should deny the petition for sterilization. No analysis of the ward's best interests is necessary under either of these scenarios.

However, if the ward's substituted judgment cannot be proved by clear and convincing evidence either way, then the Probate Act instructs us to proceed to a best interests analysis, following the six *Terwilliger* factors outlined above. As discussed, the petition for sterilization should be granted if and only if the proponent of the petition can prove it is in the ward's best interests by clear and convincing evidence, when compared to other, less intrusive alternatives currently available to the ward, as well as potential future alternatives that may become available due to scientific or medical advances.

If the court concludes, after analysis of all the above factors, that sterilization by the petitioned-for method is proven to be in the ward's best interests by clear and convincing evidence, then a petition authorizing the procedure may issue. Otherwise, the petition must be denied.

*3. Application to the Instant Case*

We now turn to reviewing the lower court's decision based on the standard we have articulated above.

The general rule is that when a trial court makes rulings after a bench trial that are fact-dependent, we will not reverse those rulings unless they are against the manifest weight of the evidence; however, to the extent that the rulings are purely legal, we review them *de novo*.

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

*Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177, 819 N.E.2d 1220, 1227 (2004).

Proper procedural safeguards were followed by the court below. K.E.J. was represented even before the filing of the petition by Raleigh, her long-standing guardian *ad litem*. K.E.J. was also represented by independent counsel who vigorously opposed the petition. The court held a bench trial during which both petitioner V.H. and the independent counsel were allowed to call witnesses to testify to K.E.J.'s mental and psychological condition, and Raleigh was given ample opportunity to cross-examine these witnesses and to speak before the court on K.E.J.'s behalf. Moreover, the judge conducted a private interview with K.E.J., which he used in tandem with her testimony and the testimony of expert witnesses to make a finding that she completely lacked capacity to make a decision regarding whether to undergo a tubal ligation.

Furthermore, under the facts of this case, the trial court did not err in using the best interests standard. Because K.E.J. sustained the head injury leading to her current lack of competence when she was eight years old, far before the age when she had the legal capacity to make decisions regarding pregnancy and childbirth, there is no way to determine what she would choose for herself now if she were competent. Any attempt to use the substituted judgment standard would be little more than wild speculation. Thus, we follow the mandate of the Probate Act by moving on to consider what course of action would be in K.E.J.'s best interests.

K.E.J.'s counsel suggests that the present judgment of a ward should be controlling, at least in a case like the present one, where fundamental constitutional rights are at stake. In support of this contention, counsel cites the language in the statute which says that decisions are to be made "in accordance with the preferences of the ward." 755 ILCS 5/11a-17(e) (West

-26-

2006). We disagree with this interpretation. When read in context, the quoted language is referring to the preferences of the ward that were "previously expressed" – *i.e.*, before the ward became incompetent. Thus, the statutory concern about the ward's preferences is part of the substituted judgment standard, rather than the establishment of a new actual judgment standard. K.E.J.'s current desire to have children, even if it were clearly and consistently expressed over the course of the proceedings below (which the evidence shows it was not), would not automatically trump all other considerations in determining whether a tubal ligation is appropriate. Moreover, the record reflects that K.E.J.'s present will was ambivalent and that on multiple occasions, her statements regarding tubal ligation seemed to reflect not her present will, but merely a desire to accommodate the anticipated preference of the person to whom she was speaking. In that regard, the court below made a finding that K.E.J. "doesn't have the ability to make up her will," so the evidentiary value of her statements at trial is dubious at best.

The case law cited by K.E.J.'s counsel in support of their interpretation is inapposite. *In re Estate of Brooks*, 32 Ill. 2d 361, 205 N.E.2d 435 (1965), dealt with an adult woman who had steadfastly refused blood transfusions for religious reasons while competent; the court ruled that it violated her constitutional rights for her to be judicially compelled to accept a transfusion while incompetent. This case is readily distinguishable from the case at hand, since the woman's statements while competent provided a clear basis for conducting a substituted judgment analysis. With respect to K.E.J., we have no such statements, and we cannot presume that any statements she makes in her current mentally handicapped state are in line with what she would wish for herself if she were competent. Moreover, the case of *In re Gardner*, 121 Ill. App. 3d 7, 459

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

N.E.2d 17 (1984), is irrelevant, as it deals with a statutory scheme for involuntary commitment of the mentally ill that is not applicable here.

Hence, we proceed to an analysis of K.E.J.'s best interests under the six factors outlined earlier. Regarding the possibility of psychological trauma or damage from either childbirth or sterilization, we find the testimony of K.E.J.'s father regarding the likely effect of a tubal ligation to be persuasive: because K.E.J. dreams of having children someday, he stated that a tubal ligation would be likely to induce severe depression in her, as she understands the permanence of the procedure. While other methods of contraception also have the effect of preventing pregnancy, they are much less intrusive in that she does not object to their use, as they allow her to maintain her hope for the future. However, this must be weighed against the testimony that if she were to have a child and it were taken away, it would be a highly traumatic event for her.

The ward's level of sexual activity weighs in favor of a permanent or at least long-lasting means of contraception: Uncontroverted testimony from multiple witnesses, including K.E.J. herself, indicated that K.E.J. was sexually active and had no plans of stopping her sexual activities in the near future.

The ward's understanding of reproduction and contraception weighs somewhat against a tubal ligation. K.E.J.'s testimony, corroborated by the testimony of counselor Pollard, shows that she does understand that intercourse leads to pregnancy and that pregnancy may be stopped through contraception. Nevertheless, under the circumstances of this case, this is not a strong factor, as Pollard also indicated that due to K.E.J.'s poor impulse control, she could be persuaded into having unprotected sex (and K.E.J. admitted that she had done this on multiple occasions).

-28-

Furthermore, neuropsychologist Larson testified that K.E.J.'s cognitive condition is unlikely to improve due to the nature of her head injury.

The evidence regarding the ability of the ward to take care of a child is not persuasive either for or against a tubal ligation. To be sure, there was a good deal of testimony supporting the proposition that K.E.J. could not take care of a child alone, particularly considering that she lacks the independent decisional capacity even to take care of herself alone. The court also made a specific finding to this effect. However, K.E.J.'s father testified that he would be willing to take care of any children she might have (though V.H. disputed this contention); in addition, it is plausible that K.E.J. might eventually be married to someone with the ability to help her raise the child, a possibility which she raised in her testimony.

Finally, the good faith of the petitioner weighs in favor of the guardian V.H.: The trial court made a specific finding that V.H. was acting in good faith, and we are reluctant to disturb that finding on appeal, since we do not have the opportunity the trial court had to observe V.H. and hear her testimony firsthand.

Considering these factors as a whole, we find that the trial court did not err in concluding that K.E.J. would have a constant need for contraception due to her inability to raise a child and the emotional pain she would suffer were a child of hers to be taken away by the state. Nevertheless, that need not justify a tubal ligation. We affirm the court's ruling to deny the petition for tubal ligation based on the presence of less intrusive and less psychologically harmful alternatives to a tubal ligation.

There are a number of potential alternatives which could serve K.E.J.'s needs better than

sterilization. One of those contraceptive methods is birth control pills, which K.E.J. is currently using. They are not physically invasive, and there was no evidence offered that K.E.J. objects to their use, thus preserving the right of personal inviolability. See *Botsford*, 141 U.S. at 251, 35 L. Ed. at 737, 11 S. Ct. at 1001. Furthermore, there has been no indication that they might be ineffective, and indeed they were recommended for use by her at her gynecological appointment with Dr. Axelrod. Moreover, although this was disputed, there was expert testimony from Dr. Hammond that favored consideration of an IUD as a more long-term contraceptive device for K.E.J.

Another contraceptive solution that might be suitable for K.E.J. is the drug Implanon, if and when it is approved for use by the FDA. As Implanon may be removed, this solution is unlikely to cause the psychological trauma associated with a more permanent solution such as a tubal ligation. Furthermore, contrary to the implications in V.H.'s brief, the fact that Implanon was not then FDA-approved as of the time of trial would arguably not bar us from considering the likelihood of its emergence as a new, less intrusive alternative. This is particularly true since Dr. Hammond testified that he expected Implanon to be FDA-approved due to its use in Europe.

Due to the presence of the foregoing alternative methods, we cannot say that V.H. has met her burden of proving by clear and convincing evidence that a tubal ligation is in K.E.J.'s best interests when compared to other methods of contraception. Hence, the trial court did not err in denying V.H.'s petition for a tubal ligation.

B. Award of Fees from the Ward's Estate

We next turn to consider whether the trial court was correct in granting V.H.'s petition

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

for attorney fees at the trial level to be paid out of K.E.J.'s estate, but in denying her petition for appellate attorney fees.

V.H. contends that we lack jurisdiction to consider whether the trial court erred in granting reimbursement for the attorney fees she incurred in the trial proceedings, because she claims that K.E.J.'s counsel failed to file their notice of appeal in a timely fashion.

Failure to file a timely notice of appeal deprives the appellate court of jurisdiction over the appeal. *Lowenthal v. McDonald*, 367 Ill. App. 3d 919, 925, 856 N.E.2d 1118, 1124 (2006). Accordingly, we lack the authority to excuse an appellant who has failed to comply with the filing requirements. *Clark v. Han*, 272 Ill. App. 3d 981, 984, 651 N.E.2d 549, 551 (1995). Under Supreme Court Rule 303(a), any notice of appeal must be filed "within 30 days after the entry of the final judgment appealed from, or, if a timely post-trial motion directed against the judgment is filed, *** within 30 days after the entry of the order disposing of the last pending post-trial motion" directed against that judgment or order. 134 Ill. 2d R. 303(a)(1).

The issue here is whether K.E.J.'s postjudgment motion dated August 14, 2006, counts as a motion "directed against" the court's July 13, 2006, order denying V.H.'s petition for tubal ligation. If so, then K.E.J.'s counsel had until 30 days after the resolution of that motion to file its notice of appeal, so its appeal is timely. 134 Ill. 2d R. 303(a)(1). However, if the motion does not fall within the requirements of Rule 303(a), then it does not extend the time allowed for the filing of an appeal and, thus, K.E.J.'s appeal must be dismissed for want of jurisdiction. This is V.H.'s argument: She says that the August 14, 2006, postjudgment motion was not "directed against" the final ruling on the petition for tubal ligation, because the sole purpose of the motion

was to challenge the court's earlier grant of attorney fees dated September 22, 2005.

We disagree with V.H.'s contention. The postjudgment motion brought by K.E.J.'s counsel was made pursuant to section 2-1203, which states: "In all cases tried without a jury, any party may, within 30 days after the entry of the judgment or within any further time the court may allow within the 30 days or any extensions thereof, file a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief." 735 ILCS 5/2-1203(a) (West 2006). In their motion, K.E.J.'s counsel requested that the court order all trial fees that had been paid to V.H.'s counsel to be returned to the estate; that is, they were seeking a modification of the July 13, 2006, judgment to include monetary relief. We find that this is sufficient to constitute a motion "directed against" the judgment (134 Ill. 2d R. 303(a)(1)), because they argued that its terms should be materially changed, even though the order itself did not mention the fees at issue. Therefore, the postjudgment motion satisfies the terms of Rule 303(a), K.E.J.'s appeal was timely, and we have jurisdiction to decide the appeal on the merits. 134 Ill. 2d R. 303(a)(1).

Moving on to substantive analysis of the fee petitions, both at the trial and the appellate levels: The general rule is that an award of attorney fees is within the discretion of the trial court, and we will not overturn a fee award absent an abuse of discretion. *Weidner v. Szostek*, 245 Ill. App. 3d 487, 493, 614 N.E.2d 879, 883 (1993). Under the Probate Act, guardians such as V.H. may obtain compensation for services they pay for on the ward's behalf: "The guardian of the person may petition the court for an order directing the guardian of the estate to pay an amount periodically for the provision of the services specified by the court order." 755 ILCS 5/11a-17(a)

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

(West 2006).  Nevertheless, this must be balanced against the guardian's obligation to responsibly manage the estate on the ward's behalf.  As a fiduciary of the ward, the guardian is held to the "highest standard of fair dealing and diligence" in all matters relating to the ward's estate.  *In re Estate of Berger*, 166 Ill. App. 3d 1045, 1056, 520 N.E.2d 690, 697 (1987).  The trial court has a concomitant duty to closely scrutinize the guardian's actions and direct the guardian's management of the estate.  *Berger*, 166 Ill. App. 3d at 1056, 520 N.E.2d at 697; *In re Estate of Mank*, 298 Ill. App. 3d 821, 699 N.E.2d 1103 (1998), citing *Wellman*, 174 Ill. 2d at 348, 673 N.E.2d at 278 (guardian is "subject to the court's direction" in spending estate resources on the ward's behalf).  Indeed, the trial court must protect the incompetent as its own ward, "vigilantly guarding his property and viewing him as a favored person in the eyes of the law."  *Berger*, 166 Ill. App. 3d at 1055, 520 N.E.2d at 697; see also *Mank*, 298 Ill. App. 3d at 826, 699 N.E.2d at 1107; *Miller v. Myer*, 46 Ill. App. 2d 106, 113-14, 196 N.E.2d 370, 374 (1964).

Counsel for K.E.J. contend that because K.E.J. said that she was unwilling to undergo a tubal ligation, it was clear that a tubal ligation was not in her best interests, so any award of fees was improper.  We disagree.  A ward's perception of her best interests is not necessarily in line with her actual best interests.  This is true of anyone who has been adjudicated mentally incompetent, and it is particularly true in the instant case, where the trial court found based on testimony from multiple sources that K.E.J. did not have the capacity to make such personal decisions for herself.  Hence, K.E.J.'s statements regarding the tubal ligation are not dispositive of the fee issue.  Rather, we defer to the trial court's finding that V.H. was acting in good faith to pursue what she saw as K.E.J.'s best interests when she brought the petition.

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

However, V.H.'s good faith does not mean that she ought to be given *carte blanche* to spend whatever she might wish for the purported benefit of her ward. "Good faith does not create authority for improper acts." *Berger*, 166 Ill. App. 3d at 1059, 520 N.E.2d at 699, citing *Nonnast v. Northern Trust Co.*, 374 Ill. 248, 29 N.E.2d 251 (1940). Rather, a balance must be struck between the benefit to be gained from a successful petition and the detriment to be done to K.E.J.'s estate. As Raleigh stated before the court, the estate is limited and K.E.J. is young; depleting the estate in pursuit of obtaining authorization for a tubal ligation, even if such an operation were found to be in K.E.J.'s best interest, is not necessarily a wise use of limited resources. A cost-benefit analysis must be undertaken to determine whether the expected gain from bringing the case to court outweighs the expected cost – and as a case drags on, and more and more fees are incurred, the chances become less of that expected gain being high enough to justify mounting legal expenses. Failure to conduct such an analysis is a failure of the fiduciary duty owed by the guardian to the ward, for it is not a responsible use of the ward's limited estate to continue spending resources past the point where it is profitable to do so. *Berger*, 166 Ill. App. 3d at 1056, 520 N.E.2d at 697. We wish to stress that when conducting such a cost-benefit analysis, the court should not see it as an all-or-nothing affair; rather, an effort must be made to gauge the point at which further expenditures are excessive, and the payment of funds from the estate stopped at that point.

We note in passing that, although the trial court eventually denied V.H.'s petition for K.E.J. to undergo tubal ligation, our analysis here does not hinge upon that fact. Even if the operation could be proven to be in K.E.J.'s best interests by clear and convincing evidence, that

-34-

would not justify any expenditures above and beyond the benefit that could be derived from the operation when compared to other contraceptive measures.

Nevertheless, we express severe doubts that the payment of such an exorbitant sum, given the size of the estate and the relatively young age of K.E.J., could withstand scrutiny under the kind of cost-benefit analysis described above.[2] Not only is $111,000 in attorney fees a high figure in absolute terms, but payment of those fees reduced the estate to only $114,000 in liquid funds. For V.H. to deplete the estate in this manner in pursuit of a tubal ligation for K.E.J., when other contraceptive methods existed, may well have fallen short of the due diligence required of a guardian. Furthermore, we cannot say that the court undertook a careful cost-benefit analysis to determine the point at which V.H.'s continued pursuit of her petition became detrimental to the future financial security of the ward. Lack of such an analysis is an abuse of the court's discretion, as it falls short of the vigilance required in ensuring that a ward's estate is responsibly spent. See *Berger*, 166 Ill. App. 3d at 1056, 520 N.E.2d at 697; *Myer*, 46 Ill. App. 2d at 113-14, 196 N.E.2d at 374. Hence, we remand for the court below to conduct such an analysis.

Furthermore, we find that the court did not abuse its discretion in denying V.H.'s petition for appellate fees to be paid from the estate. As discussed earlier, the amount of attorney fees that the court had already granted to V.H.'s counsel was extremely high in light of the financial condition of the estate at the time; it was not at all unreasonable for the court to find that any further expenditure of resources in pursuit of a tubal ligation would be an unwise use of the

_____

[2] We note that V.H. makes no argument in her brief regarding the propriety of trial fees, choosing instead to rest solely on her jurisdictional argument with respect to K.E.J.'s appeal.

Nos. 1-06-2263 & 1-06-3077 & 1-07-0618 cons.

estate's limited resources, and thus conclude that granting V.H.'s motion would be a violation of the court's duty to safeguard the ward's estate.  See *Berger*, 166 Ill. App. 3d at 1056, 520 N.E.2d at 697; *Wellman*, 174 Ill. 2d at 348, 673 N.E.2d at 278.

Affirmed in part; reversed in part and remanded for further proceedings.

McBRIDE, P.J., and McNULTY, J., concur.

| | **REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**<br>**(Front Sheet to be Attached to Each Case)** |
|---|---|
| Please use the following form | *In re* ESTATE OF K.E.J., a Disabled Person<br><br>(V.H.,<br><br>Petitioner-Appellant,<br><br>v.<br><br>K.E.J.,<br><br>Respondent-Appellee). |
| Docket No.<br><br>COURT<br><br><br>Opinion Filed | No. <u>1-06-2263 & 1-06-3077 & 1-07-0618 cons.</u><br><br>Appellate Court of Illinois<br>First District, <u>SIXTH</u> Division<br><br><u>April 18, 2008</u><br>(Give month, day and year) |
| <br><br>JUSTICES | JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:<br><br><u>  McBride, P.J., and McNulty, J.  </u>, concur. |
| APPEAL from the Circuit Court of Cook County; the Hon____ Judge Presiding. | Lower Court and Trial Judge(s) in form indicated in margin:<br><br>Appeal from the Circuit Court of Cook County.<br><br>The Hon. <u> James Riley </u> Judge Presiding. |
| <br><br><br><br><br>APPELLANTS:<br>John Doe, of Chicago | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br><u>APPELLANT: Lester L. Barclay and Crystal L. Roberts, Barclay, Dixon & Smith, P.C., 39 S. LaSalle St., Suite 900, Chicago, IL 60603</u> |
| For APPELLEES, Smith and Smith of Chicago | <u>APPELLEES: John W. Whitcomb, Cheryl R. Jansen, Byron Mason, Mariangela Monteiro, and Laura J. Miller, Equip for Equality, 20 N. Michigan, Chicago, IL 60602</u> |
| Add attorneys for 3rd party appellants and/or appellees. | |